MADELEINE M. LANDRIEU, Judge.
|TThe plaintiffs, Julia Banks and Bay-nard Taylor, appeal the trial court’s judgment dismissing their medical malpractice case against the defendant, Children’s Hospital, following a full trial on the merits. We find that the trial court erred by entering judgment rather than sending the jury back for further deliberations or ordering a new trial, as required by Louisiana Code of Civil Procedure Article 1813, after the jury returned inconsistent answers on the special verdict form. Reviewing the record de novo, however, we reach the same result as the trial court. We find, as did the trial court, that the plaintiffs failed to establish by a preponderance of the evidence that the negligence of Children’s Hospital caused the death of the plaintiffs’ daughter, Miya Banks, or caused her to lose a chance of survival. On this basis, we affirm the judgment of the trial court.
FACTS AND PROCEEDINGS BELOW
On November 20, 2004, the plaintiffs’ eight-year-old daughter, Miya Banks, was admitted to Children’s Hospital for a liver transplant because her liver was failing due to Hemophagocytic Lymphohistiocyto-sis (“HLH”), a severe blood ^disorder. The liver transplant was performed six days later. It is undisputed that Miya’s condition was extremely serious, and even life-threatening, on the day she entered the hospital and that it remained so throughout her entire stay. Approximately eighteen days after the transplant, HLH developed in Miya’s new liver. Because of Miya’s poor condition,[1] she was not a ean-didate for a bone marrow transplant, the only known cure for HLH. After suffering many complications, Miya died at Children’s Hospital on January 29, 2005. Before her death, two incidents occurred that her parents allege to be negligence on the part of Children’s Hospital that caused and/or contributed to Miya’s death: a January 7, 2005 infusion of blood platelets that allegedly were contaminated with bacteria; and a January 25, 2005 infusion of platelets that were administered through a T-tube inserted into Miya’s abdominal area rather than through the central intravenous port in Miya’s chest.[2]
Miya’s parents timely filed a medical malpractice complaint against Children’s Hospital regarding the January 25th incident only. Following the Medical Review Panel’s opinion that Children’s Hospital had breached the standard of care, but that the breach had not caused any damages to Miya, the plaintiffs timely filed the instant lawsuit on February 20, 2008. On December 15, 2010, the plaintiffs filed an amended petition alleging for the first time that the January 7, 2005 incident constituted additional negligence on the part of Children’s |3Hospital that had contributed to Miya’s suffering and death. Children’s Hospital raised exceptions of prematurity and prescription/peremption as to the claims raised in the amended petition. Following a hearing, the trial court denied these exceptions.[3]
The matter was tried before a jury beginning on February 25, 2013. Children’s Hospital stipulated prior to trial that it had breached the applicable standard of care *1267 on January 25, 2005 by giving Miya platelets through the T-tube rather than through the central port. On March 1, 2013, at the conclusion of trial, the jury returned the special verdict form, which was composed of sixteen interrogatories. The jury found that: (1) the plaintiffs failed to prove the standard of care applicable to Children’s Hospital in its infusion of contaminated platelets into Miya on January 7, 2005;[4] (2) the stipulated breach of the standard of care by Children’s Hospital on January 25, 2005 did not cause or contribute to Miya’s death, or cause Miya any conscious pain and suffering; (3) Miya’s mother, Julia Banks, suffered damages in the amount of $125,000.00 for her grief and mental anguish on account of Miya’s death as a result of the January 25, 2005 infusion of platelets into her T-tube; (4) Miya’s father, Baynard Taylor, suffered damages in the amount of $50,000.00 for his grief and mental anguish on account of Miya’s death as a result of the January 25, 2005 infusion of platelets into her T-tube; and |4(5) Children’s Hospital’s admitted breach of the standard of care did not result in Miya’s loss of a chance of survival.
Recognizing the jury’s answers to be inconsistent, the trial judge, after reading the verdict in open court, questioned the jurors on the record. The trial judge noted that awarding damages to Miya’s parents was wholly inconsistent with the jury’s other findings: that the plaintiffs failed to prove a breach of the standard of care by Children’s Hospital with regard to the January 7th incident; and that Children’s Hospital’s breach on January 25th did not cause Miya’s death, any conscious pain and suffering, or the loss of a chance of survival. The trial transcript reflects that, in response to the trial court’s questioning, the jury foreperson and one other juror indicated that the jury had become confused by trying to follow the instructions regarding how to proceed in answering the interrogatories, and therefore believed that the jury would benefit from further deliberations. At that point, the trial judge did not send the jurors back for further deliberations or order a new trial. On April 5, 2013, the trial court rendered a written judgment in favor of Children’s Hospital, dismissing the plaintiffs’ original and amended petitions with prejudice. The plaintiffs now appeal that judgment.
ISSUES
On appeal, the plaintiffs contend that the trial court committed legal error by failing to either send the jury back for further consideration of its inconsistent answers or order a new trial, as required by Louisiana Code of Civil Procedure Article 1813(E). They further contend that this legal error warrants de novo preview of the record on appeal. The plaintiffs argue that they proved by a preponderance of the evidence that Children’s Hospital’s negligent infusion of platelets through Miya’s T-tube, rather than through her central intravenous port, on January 25, 2005 caused Miya to lose a chance of longer survival, for which they are entitled to ■recover at least the amounts of damages found by the jury. In addition, the plaintiffs contend they proved by a preponderance of the evidence that Children’s Hospital breached the applicable standard of care by failing to adequately test the platelets that were infused into Miya on January 7, 2005, which caused Miya discomfort and fever.
The plaintiffs therefore argue that we should reverse the trial court’s judgment upon de novo review. They further con *1268 tend that we should award them at least $175,000 in damages for Miya’s loss of a chance of survival due to the January 25th incident, plus an additional unspecified amount of survival damages for Miya’s own pain and suffering as a result of both the January 7th and January 25th incidents.
In response, Children’s Hospital contends that de novo review is not warranted, and that the appropriate standard of review on appeal is manifest error. Alternatively, the defendant submits that even if it is reviewed de -novo, the record demonstrates that the plaintiffs failed to prove by a preponderance of the evidence that any breach by Children’s Hospital caused or contributed to Miya Banks’ pain, suffering or death, or caused her to lose a chance of survival, and that, therefore, the trial court’s judgment should be affirmed.
| (¡DISCUSSION
I. The trial court committed legal error triggering de novo review.
Louisiana Code of Civil Procedure 1813, entitled “General verdict accompanied by answers to interrogatories,” provides:
A. The court may submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict. The court shall give such explanation or instruction as may be necessary to enable the jury both to make answers to the interrogatories and to render a general verdict....
B. The court shall inform the parties within a reasonable time prior to their arguments to the jury of the general verdict form and instructions it intends to submit to the jury, and the parties shall be given a reasonable opportunity to make objections.
C. When the general verdict and the answers are harmonious, the court shall direct the entry of the appropriate judgment upon the verdict and answers.
D. When the answers are consistent with each other but one or more is inconsistent with the general verdict, the court may direct the entry of judgment in accordance with the answers, notwithstanding the general verdict, or may return the jury for further consideration of its answers and verdict, or may order a new trial.
E. When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, the court shall not direct the entry of judgment but may return the jury for further consideration of its answers or may order a new trial. (Emphasis supplied).
In this case the jury was presented with sixteen interrogatories.[5] Each question was followed by a written instruction regarding how the jury should proceed based upon their answer to that particular question and, in some cases, their answer(s) to one or more of the preceding interrogatories. Interrogatory No. 1, “Do you find by a preponderance of the evidence that plaintiffs proved the 17standard of care applicable to CHILDREN’S HOSPITAL in its infusion of contaminated blood platelets into MIYA BANKS on January 7, 2005?” was answered “NO.” The accompanying instruction stated that if the jury’s answer was “YES,” it should proceed to Interrogatory No. 2, but if the answer was “NO,” they should go to Interrogatory No. 10. Accordingly, the jury proceeded to Interrogatory No. 10, skipping Nos. 2 through 9, which addressed breach, causation and damages as related to the January 7th incident.
*1269 Interrogatory No. 10, “Do you find by a preponderance of the evidence that the stipulated breach of the standard of care by CHILDREN’S HOSPITAL on January 25, 2005 resulted in or in any way contributed to the death of MIYA BANKS and is therefore a legal or proximate cause of the damages claimed by plaintiffs as a result of that death?” was also answered “NO.” The instruction accompanying that question stated: “If YES, please go to Interrogatory No. 11. If you answered NO to this Interrogatory AND you answered NO to Interrogatory No. 3, please proceed to Interrogatory No. 15.” The jury, as reported by the foreman afterward in open court, was confused by this instruction because it did not address what they should do if, (as was the case), they had answered “NO” to Interrogatory No. 10 but, as instructed, had skipped Interrogatory No. 3.
The jury therefore proceeded to answer Interrogatory No. 11. No. 11 asked whether Miya Banks had suffered conscious pain and suffering as a result of the negligence of Children’s Hospital on January 25th, to which the jury answered “NO.” The accompanying instruction stated that if the jury’s answer was “NO,” they should skip No. 12 (asking them to quantify damages for the aforementioned pain and suffering) and move on to No. 13, which they did. Interrogatory Nos. 13 and 14 asked the jury to itemize what sums of money would reasonably and fairly Iscompensate plaintiffs Julia Banks and Baynard Taylor, respectively, for the losses each had “suffered as a result of MIYA BANK’S death as a result of the January 25, 2005 infusion of platelets into her T-tube.” The jury answered that each parent had incurred damages for “grief and mental anguish,” in these amounts: $125,000.00 with respect to Julia Banks and $50,000.00 with respect to Baynard Taylor. The jury was instructed to stop there if they had answered ‘TES” to Interrogatory Nos. 3 or 10 and had completed Nos. 7, 8, 9, 11, 12, or 14. Despite the fact that they had not answered “YES” to either No. 3 or No. 10 (they had not answered No. 3 at all and had answered “NO” to No. 10), the jury moved on to No. 15, which asked whether any breach of the standard of care by Children’s Hospital had resulted in Miya Banks’ loss of a chance of survival. The jury answered “NO” to this question. As instructed, they did not go on to the final interrogatory, No. 16 (which asked them to quantify the amount of damages incurred by the plaintiffs as a result of Miya’s loss of a chance of survival), but stopped and turned in the signed verdict form.
When the trial judge received the verdict form, she noted that it presented a problem because the jury had found that Miya’s parents were entitled to specific monetary damages for their grief and mental anguish “suffered as a result of Miya’s death as a result of the January 25, 2005 infusion of platelets into her T-tube,” but also had found that the stipulated breach by Children’s Hospital on that date did not cause Miya’s death (or her loss of a chance of survival). Without acknowledging that the instruction accompanying Interrogatory No. 10 was misleading, the trial judge indicated that the jury should have skipped from Interrogatory No. 10 to No. 15. The trial judge then asked the foreperson if the jury needed to “go talk some more,” to which the foreperson responded “I think we 19do.” The foreperson further noted that the monetary amounts the jury listed were intentional because the jury believed that the negligence of the defendant had not caused Miya’s death but had caused “emotional distress” to her parents.
At this point one of the jurors said that she felt the jury ought to have a chance to deliberate further, expressing the view that the jurors may have voted differently *1270 on the “loss of a chance of survival” issue in Interrogatory No. 15 if they had known that awarding damages to Miya’s parents, as the jury had found in response to Interrogatory Nos. 13 and 14, was incompatible with their answer to No. 10.
Recognizing the jurors’ confusion, the trial judge nevertheless declined to send the jury back for further deliberations, stating:
I can’t change what’s happened and I’m not, I would love to send you all out because in essence, quite honestly, I may have to try it again, if there was some level of confusion.... In that regard, I can’t legally send you back out, you’ve answered the question. If you hadn’t answered the question it would be a different conversation, but because there are answers to the questions I have to accept those answers as they are.
At this point the trial judge dismissed the jury, granted the defendant’s motion to make the judgment of the jury the judgment of the court, and took under advisement the plaintiffs’ motion for judgment notwithstanding the verdict (“JNOV”). The trial judge requested that both parties file briefs addressing the grounds for a JNOV and how the inconsistent jury responses should be resolved. The trial judge further noted that there was no issue as to the January 7, 2005 incident because the jury unambiguously found that the plaintiffs had failed to prove the applicable standard of care. The judge therefore directed that the post-trial briefs address only whether the damages the jury found to have been incurred by Miya’s parents as a result of the January 25th incident legally could be awarded Imto them in view of the jury’s contradictory finding that the January 25th breach had not caused Miya’s death. When asked by the plaintiffs’ counsel about one juror’s comment that the jury might have responded differently to the interrogatories addressing “loss of a chance of survival” had they understood the implications of their prior responses, the trial judge remarked: “That’s your argument regarding a mistrial_Quite honestly ... I’ll probably mistry it.”
Neither party filed a motion for mistrial. After receiving the post-trial briefs, the trial court denied the plaintiffs’ motion for JNOV and rendered judgment dismissing the plaintiffs’ claims against Children’s Hospital.
There is no question that Louisiana Code of Civil Procedure Article 1813 E applies to the circumstances presented here. The jury’s answers to the interrogatories are not only inconsistent with each other, but the responses to Interrogatory Nos. 13 and 14 are inconsistent with the general verdict rendered by the trial court. Moreover, in this case, one or more of the jury’s answers would have been inconsistent with any general verdict the trial court possibly could have rendered. Finally, the record shows that the jury’s inconsistent responses were undoubtedly affected by misleading, and in some respects erroneous, directions printed on the special verdict form as to how to proceed in answering the interrogatories. Under these circumstances, the trial court committed legal error by failing to either “return the jury for further consideration of its answers” or “order a new trial” pursuant to the mandatory directive of Code of Civil Procedure Article 1813 E.
Children’s Hospital argues that Article 1813 does not apply to this case because the jury was given only written interrogatories, rather than written interrogatories “together with appropriate forms for a general verdict.” Citing this |,, court’s pri- or decisions in Brown v. White[6] and Este v. *1271 Roussel,[7] Children’s Hospital asserts that Article 1812 “gives the trial court the power and authority to resolve the inconsistent jury verdict.”
We reject this argument. The defendant’s reliance upon Brown and Este is misplaced, as both cases involved incorrect jury instructions on the law applicable to the merits of the respective cases. The situation presented here is distinguishable. In this case, no party contends that there was an error in how the jury was charged or instructed on the law, but rather that the directions on the special verdict form were confusing.
More significantly, Louisiana Code of Civil Procedure Article 1812, which the plaintiffs contend applies in lieu of Article 1813, does not address what to do if the jury returns inconsistent answers to the interrogatories posed; it merely lists the proper subjects to be covered by the special interrogatories in personal injury and wrongful death actions.[8] The jury’s return of inconsistent answers is addressed _Jj2only by Article 1813 E, which Louisiana courts have consistently applied to special verdict forms composed of interrogatories alone. See: Ferrell v. Fireman’s Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742; Daigle v. White, 544 So.2d 1260 (La.App. 4th Cir.1989); Gremillion v. Derks, 96-0412 (La.App. 4 Cir. 11/18/96), 684 So.2d 492; Palumbo v. Shapiro, 2011-0769 (La.App. 4 Cir. 12/14/11), 81 So.3d 923. In Palumbo, we stated:
The Louisiana Supreme Court in Ferrell v. Fireman’s Fund Ins. Co. has instructed us, however, that when the answers on a special verdict form are inconsistent, we are to apply the provisions of La. C.C.P. art. 1813 E. See Ferrell v. Fireman’s Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742. In Ferrell the jury in responses to a special verdict form found first that the plaintiffs negligence was not a legal or proximate cause of the accident, but nonetheless found him 30% at fault. Id. at 747_Such inconsistent responses to special verdict interrogatories create an error of law. Id.
Id., 2011-0769, p. 10, 81 So.3d at 929.
Given the jury’s inconsistent responses in the case before us, and that these responses were undoubtedly affected by misleading directions on the special verdict form itself regarding how the jury should proceed, we conclude that the trial court erred as a matter of law by failing to either return the jury for further delibera *1272 tions or order a new trial, which are the only two options presented by Article 1813 E.
Generally, a jury’s factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Stobart v. State through Dept. of Transp. and Dev., 617 So.2d 880, 882 (La.1993). However, where, as here, legal error has interdicted the fact finding process, the manifest 11serror standard no longer applies and, if the record is complete, the appellate court should make its own de novo review of the record. Evans v. Lungrin, 1997-0541, pp. 6-7 (La.2/6/98), 708 So.2d 731, 735; Lam v. State Farm Mut. Auto. Ins. Co., 05-1139, p. 3 (La.11/29/06), 946 So.2d 133, 135; Ullah, Inc. v. Lafayette Ins. Co., 2009-1566, p. 17 (La.App. 4 Cir. 12/17/10), 54 So.3d 1193, 1203. Applying de novo review, the appellate court independently views the record, without granting any deference to the trial court’s findings, to determine the preponderance of the evidence. Ferrell, supra, 94-1252, p. 7, 650 So.2d at 747; Gonzales v. Xerox Corp., 254 La. 182, 320 So.2d 163, 165 (1975).[9]
This court has previously held that the trial court’s submission to the jury of “a verdict sheet which either confuses or misleads the jury,” may constitute reversible legal error that triggers de novo review. Niklaus v. Bellina, 96-2411, p. 7 (La.App. 4 Cir. 5/21/97), 696 So.2d 120, 124. Where, however, the legal error does not affect all the jury’s findings, the appellate court should confine its de novo review to only those findings that have been interdicted by the error. Picou v. Ferrara, 483 So.2d 915, 918 (La.1986); Lam, supra, 2005-1139, p. 3 (La.11/29/06), 946 So.2d at 135-36.
Accordingly, at least with respect to the issues affected by the trial court’s legal error, we review this record de novo to determine whether the plaintiffs proved their case by a preponderance of the evidence.
|14A. January 7, 2005 Transfusion
On appeal, the plaintiffs argue that they proved by a preponderance of the evidence that Children’s Hospital breached the applicable standard of care on January 7, 2005 by giving Miya a transfusion of platelets that contained bacteria.
We first note that, in accordance with the law cited above, this' particular issue does not require de novo review. The jury unambiguously found, in response to Interrogatory No. 1, that the plaintiffs failed to prove the standard of care that applied to Children’s Hospital with regard to the January 7th transfusion. This finding was completely separate from, and not inconsistent with, any of the jury’s other responses, all of which related to the January 25th incident. Moreover, this finding was not affected by the erroneous directions that accompanied some of the later interrogatories. As it was not tainted by legal error, the jury’s factual finding as to the January 7th incident is reviewed under the manifest error standard. See Picou, supra; Lam, supra. Under that standard, the appellate court must “give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even *1273 though the appellate court may feel that its own evaluations and inferences are as reasonable.” Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).
Considering the facts of this case, however, we would not overturn the jury’s conclusion as to the January 7th incident under either the manifest error or de novo standard of review. It is undisputed that the blood used in the January 7, 2005 transfusion was obtained by Children’s Hospital from an outside blood bank. 11fiMiya’s treating physician, Dr. Tammuel-la Singleton,[10] who was qualified as an expert in pediatric hematology and oncology, testified that the blood bank, in this case the Blood Center of New Orleans, was responsible for testing the blood. Because bacterial infection is a risk in every blood transfusion, patients are required to sign consent forms disclosing this risk.[11] Dr. Claude Minor, who was qualified as an expert in general surgery and critical medicine, concurred in Dr. Singleton’s testimony. Dr. Minor further testified that because blood obtained from an outside blood bank generally must be used within 48 to 72 hours, the patient normally is given the transfusion before the results of a five-day blood culture can be obtained.[12]
Significantly, the plaintiffs presented no testimony, expert or otherwise, that the failure of Children’s Hospital to test the blood from an outside blood bank and obtain the results prior to administering the blood to Miya violated the applicable standard of care. Dr. Adel Shaker, qualified as an expert in anatomic and forensic pathology, first testified that Children’s Hospital had violated the applicable standard of care by failing to pre-test the blood; however, upon further questioning, he admitted that he did not know that the blood had been obtained from an outside blood bank, but had assumed it had come from the hospital’s blood bank. Absent any testimony showing that the applicable standard of care requires a hospital to culture blood obtained from an outside blood bank prior to administration, we conclude, as did the jury, that the plaintiffs failed to prove the applicable standard 11fiof care with regard to the January 7th transfusion by a preponderance of the evidence.
B. January 25, 2005 Transfusion
As previously stated, the issue of Children’s Hospital’s liability with regard to the January 25th transfusion requires de novo review. Because Children’s Hospital stipulated to its breach of the applicable standard of care on January 25th in administering platelets to Miya through her T-tube rather than her central intravenous port, the first issue we must address is whether this breach caused or contributed to Miya’s death or caused her to lose a chance of longer survival. The plaintiffs, in their appellant brief, do not challenge the jury’s finding that the breach did not cause Miya’s death, but argue only that they proved by a preponderance of the evidence that' the January 25th breach caused Miya to lose a chance of survival. The plaintiffs further argue that this loss resulted in damages of at least $175,000.00, the amount the jury found Miya’s parents *1274 had suffered due to their grief and mental anguish as a result of Miya’s death.

Applicable Law

Louisiana law allows recovery not only for a patient’s wrongful death as a result of medical malpractice, but also for the loss of a chance of longer survival. See: Smith v. State, Dep’t of Health & Hospitals, 95-0038, p. 1 (La.6/25/96), 676 So.2d 543, 544; Martin v. E. Jefferson Gen. Hosp., 582 So.2d 1272, 1278 (La.1991). A claim for “loss of a chance” is a distinct compensable injury, different from a wrongful death claim, although the two theories of recovery generally rely upon the same evidence as proof. In a case where the alleged victim of the |17medical malpractice has died, the loss of a chance claim relieves the plaintiff of the often “unreasonable burden” of proving that the patient would have survived if properly treated. Martin, supra, at 1278. Instead, “the plaintiff must prove by a preponderance of the evidence that the tort victim had a chance of survival at the time of the professional negligence and that the tort-feasor’s action or inaction deprived the victim of all or part of that chance.... ” Smith, supra, p. 6, 676 So.2d at 547. In other words, the issue is whether the tort victim, more probably than not, would have survived longer or had a better outcome but for the defendant’s negligence.
Once negligence and causation have been established, the plaintiff must prove the value of the lost chance, which is different from the value of a wrongful death or survival claim. The factfinder must make a subjective determination of the value of that loss, fixing the amount of money that would adequately compensate the claimants for that particular cognizable loss. Smith, supra, p. 9, 676 So.2d at 548. In doing so, the factfinder is “allowed to consider an abundance of evidence and factors, including evidence of percentages of chance of survival along with evidence such as loss of support and loss of love and affection, and any other evidence bearing on the value of the lost chance.” Smith, supra, p. 11, 676 So.2d at 549.

Causation

Under the circumstances of this case, the determination of whether Miya lost a chance of longer survival as a result of the January 25th transfusion unquestionably involves complex medical issues. When, as here, “the causal connection in such a complex medical case is not within the province of lay persons to assess,” we must rely upon the expert testimony to decide the issue. Webb v. Tulane Med. Ctr. Hosp., 96-2092, p. 7 (La.App. 4 Cir. 10/1/97), 700 So.2d 1141, 1144 (citing Pfiffner v. Correa, 94-0924, 0963, 0992 (La.10/17/94), 643 So.2d 1228).
Six physicians testified as experts in this case, two presented by the plaintiffs and four by the defendant. The plaintiffs’ two experts were Dr. Adel Shaker, a pathologist; and Dr. Craig Kennedy, an emergency room physician.[13] The defendant’s experts included Dr. Claude Minor, a general surgeon and member of the medical review panel; Dr. Tammuella Singleton, a pediatric hematologist oncologist who was Miya’s treating physician throughout her stay at Children’s Hospital; and two pathologists: Dr. Gerald Liuzza and Dr. Her-nán Correa, a pediatric pathologist who performed the autopsy on Miya.[14] After considering and weighing the testimony of these experts, along with the evidence in support thereof and the relative strength of the experts’ qualifications, we conclude that the plaintiffs failed to prove by a preponderance of the evidence that the *1275 January 25, 2005 administration of platelets to Miya through her T-tube instead of through her central port caused Miya to lose a chance of longer survival.
We first note that there was no disagreement among the experts as to the following facts. Miya died from complications of HLH, a disease that was fatal to Miya because her liver transplant had ruled her out as a candidate for a bone marrow transplant, the only possible cure for HLH. Throughout her stay at Children’s Hospital, Miya’s white cell or Absolute Neutrophil Count (ANC) was zero on a scale in which 1500 is considered normal and less than 200 is considered “profoundly neutropenic;” thus, Miya had virtually no ability to fight infection. |19The January 25th administration of platelets to Miya through her T-tube, which was put in place for drainage of bile and/or access to the biliary system following Miya’s liver transplant, was an unprecedented mistake that none of her treating physicians nor any of the experts testifying had ever known to have happened before. Children’s Hospital personnel and/or Miya’s doctors recognized the mistake approximately one hour after the transfusion began, halted the transfusion, informed Miya’s mother (who was not present at the time) as soon as she returned to the hospital, and monitored Miya closely thereafter (ordering additional tests precisely because the potential effect on Miya was unknown). All experts acknowledged that the platelets administered to Miya through her T-tube were sterile — that is, that there was no evidence of bacterial contamination. Within this factual framework, the experts’ testimony differed as to whether the January 25th incident contributed to Miya’s death four days later, or, alternatively, caused her to lose a chance of longer survival.
Our consideration of the expert testimony and medical evidence begins with the autopsy, performed by Dr. Correa. The autopsy report lists the immediate cause of death as “Septic shock in a child who required a liver transplantation for [HLH] related [to] fulminant hepatic necrosis,[15] and associated bone marrow aplasia.” Details of Miya’s final diagnosis listed on the autopsy report show that the septic shock or sepsis was due to the presence of enter-ococcus bacteria. None of the experts dispute that the type of bacteria found in Miya’s system after her death was entero-coccus faecalis.[16] The autopsy also lists as diagnoses: typhilitis, an inflammation of the intestines; and pneumatosis intestinal-is, a micro-perforation 12nof the small intestine. Dr. Correa testified that HLH “damages the bone marrow. That’s why she [Miya] had no white blood cells, no platelets.... ” He further testified that Miya’s lack of white blood cells and bone marrow left her with no defenses and at a very high risk for infections, such as ty-philitis. Significantly, Dr. Correa testified that he found no objective evidence that any harm had been done to Miya by the administration of platelets to her through the T-tube.
The plaintiffs’ two experts, Drs. Kennedy and Shaker, both opined that the January transfusion of platelets through Miya’s T-tube contributed to her death. Dr. Kennedy, an emergency room physician, opined that the January 25th transfusion decreased Miya’s chances of survival from “weeks to months if not years” to just four *1276 days. Dr. Kennedy testified that the infusion of platelets into Miya’s T-tube “compromised the integrity of the bile mucosa and caused introduction of pathogenic bacteria into the liver sinusoids and into her bloodstream,” which then caused or hastened Miya’s “terminal septic process.” He also testified that the January 25th infusion of platelets exacerbated or worsened Miya’s typhilitis and contributed to her intestinal perforation.
Dr. Shaker, a pathologist, opined that the administration of platelets through the T-tube was “a major contributing factor” in causing Miya additional pain and discomfort and ultimately, her death. As Dr. Shaker demonstrated at trial using anatomic animations, his theory was that the infusion of platelets through the T-tube into Miya’s biliary system obstructed the flow of bile, causing it to back up into Miya’s liver and destroy her liver cells. He specifically testified that the platelets given to Miya on January 25th were sterile and could not have contained | ⅞1 enterococcus bacteria that caused Miya’s sepsis. He agreed that sterile platelets cannot, scientifically, introduce bacteria into a patient’s system. Asked about the typhilitis listed on the autopsy, Dr. Shaker said that, while he could not determine with certainty whether the liver failure or the typhilitis had caused Miya’s death, he believed that the typhilitis and associated perforation of the intestine, which allowed free air into Miya’s abdomen, had developed after the T-tube incident.
Dr. Claude Minor, presented by the defendant, is a surgeon who has been in practice since 1983 and who was qualified as an expert in general surgery and critical medicine. Dr. Minor, the plaintiffs’ choice on the medical review panel, testified that he had experience inserting T-tubes, repairing biliary obstructions and perforations of the colon, performing bile duct expiration, assisting in liver transplants and caring for liver transplant patients in the ICU. Dr. Minor testified that there was no objective evidence to support Dr. Shaker’s opinion that the administration of platelets through Miya’s T-tube had caused a blockage or backup of bile in the biliary system. In support of this testimony Dr. Minor cited medical records showing that on January 25th, Miya had received 71 c.c.’s of platelets in approximately 65 minutes when the transfusion was stopped. According to Dr. Minor, this slow rate of administration — 1.7 c.c.’s or 18 drops per minute — -by gravity, indicated that the platelets were flowing directly down into the small bowel, rather than up into the biliary tree. Dr. Minor testified that if there had been a blockage, as Dr. Shaker had assumed, the drip of platelets from the bag would have stopped; however, there was no evidence of a stoppage in the medical chart. In addition, medical tests showed that a particular enzyme, or bilirubin, that would have been elevated if there had been a biliary obstruction, was not elevated, but, in fact, remained the same before and after the T-tube transfusion. Finally, the 122autopsy showed no biliary obstruction, but rather showed that the bile ducts were open, and that Miya’s biliary enzymes were not elevated.
Dr. Minor also indicated how the medical evidence refuted Dr. Kennedy’s opinion that the T-tube transfusion had caused Miya’s sepsis and/or exacerbated her ty-philitis or the perforation found in her intestine. Dr. Minor opined that entero-coccus bacteria, generally found inside one’s bowel, leaked into Miya’s abdomen due to a micro-perforation that eventually allowed air to collect between the walls of her colon, a condition known as pneumato-sis intestinalis. He stated that the medical records contained evidence that the perforation existed as early as January 21st, making it unlikely that it had been caused *1277 by platelets infused through the T-tube on January 25th. Dr. Minor explained that the fact that the pneumatosis intestinalis was not diagnosed until January 26th does not necessarily support Dr. Kennedy’s assumption that the January 25th transfusion caused this condition. Dr. Minor noted that the perforation was located in Miya’s sigmoid colon, far (about 20 to 30 feet) from the area where the T-tube was inserted, casting further doubt upon Dr. Kennedy’s opinion that platelets entering through the T-tube caused or worsened the perforation. Dr. Minor stated there was no medical evidence to support Dr. Kennedy’s opinion that Miya could have lived for weeks or months longer than she did. Dr. Minor concluded that Miya died due to complications of HLH, and that the January 25th incident did not cause her to lose a chance of survival.
The next expert presented by the defendant was Miya’s treating physician at Children’s Hospital, Dr. Tammuella Singleton. Dr. Singleton was qualified without objection as an expert in pediatric hematology oncology. She testified that she had extensive experience treating children with HLH, and that she was an | ^employee of Louisiana State University, not Children’s Hospital. She testified that HLH is not a common disease, and that only a pediatric oncologist would be familiar enough with the condition to treat it. Dr. Singleton testified that Miya died from complications of HLH, and that the January 25th transfusion through Miya’s T-tube did not contribute to her death. Dr. Singleton confirmed that Miya’s HLH had recurred in her new liver after her transplant; that Miya’s HLH was terminal because she was not a candidate for a bone marrow transplant; that Miya’s ANC was zero and never improved during the entire length of her hospitalization; and that Miya had “coded” or gone into cardiac arrest multiple times before the occurrence of either alleged act of negligence by Children’s Hospital. Dr. Singleton testified that, if the enterococcus bacteria that caused Miya’s septic shock had come from the platelets given her on January 25th, this specific bacteria would have been present in the cultures of those platelets; however, it was not, as the platelets were sterile. She further testified that the medical records showed the presence of enterococcus bacteria in Miya’s bloodstream on January 23rd, two days before the T-tube transfusion.
Like Dr. Minor, Dr. Singleton testified that there was no evidence of an obstruction of Miya’s biliary ducts, as Dr. Shaker had opined. She confirmed that the medical records did not reflect, nor was she ever informed, that the I.V. drip administered on January 25th had stopped or gotten clogged up at any point. Dr. Singleton stated that the mistaken administration of platelets through a T-tube was “uncharted territory” because as far as she knew, it had never happened before. She explained that Miya’s central intravenous port, through which the platelets should have been given, led directly into Miya’s bloodstream; whereas the T-tube led indirectly to the bloodstream through the bowel. Because she was unsure of 124the consequences of infusing platelets through the T-tube, Dr. Singleton monitored Miya’s condition and her lab results very closely after the January 25th incident. Specifically, she checked Miya’s bilirubin frequently and noted that it remained unchanged; there was no elevation, which would have indicated an obstruction. Dr. Singleton also promptly informed Miya’s mother of the mistake that had occurred and also that the consequences to Miya were unknown.
Dr. Singleton testified that typhilitis is a known complication of the profound neu-tropenia (ANC count below 200) that Miya had been suffering from for months prior *1278 to January 25th. Because of the risk of typhilitis, Miya had been receiving antibiotics from the time she entered the hospital, although the typhilitis was not diagnosed until January 27th. Dr. Singleton testified that the most-dreaded complication of HLH is pneumatosis intestinalis, a perforation that allows air from the intestine to seep into the abdomen. Dr. Singleton testified that this condition showed up on X-rays of Miya’s abdomen taken on January 23rd. She further testified that Miya began having severe abdominal pain on the night of January 24th, as a result of which she was administered Fentanyl, a powerful pain medication, during the early morning hours of the 25th, before the T-tube transfusion. The medical records confirm that Miya was given Fentanyl hours before the January 25th transfusion and continued to receive the medication regularly until her death. Based on this evidence, Dr. Singleton opined that Miya’s increased pain and distended abdomen during her last four days were due to the pneumatosis intestinalis, not to the transfusion she received through her T-tube. Dr. Singleton concluded that the T-tube incident did not cause Miya any additional pain or suffering, nor did it cause her to lose a chance of longer survival.
lasThe defendant’s final expert was Dr. Gerald Liuzza, who had been board certified in clinical and anatomical pathology since 1982 and forensic pathology since 1987. Dr. Liuzza testified that in addition to working at hospitals and in the coroner’s office, he had taught pathology on the faculty of LSU Medical School for 23 years and had published multiple articles on the subject. Dr. Liuzza, after having reviewed all the expert testimony and medical records, including the more than 100 slides from Miya’s autopsy, testified that the January 25th infusion of platelets through the T-tube made no contribution to Miya’s death, pain or suffering; nor did it cause her to lose a chance of survival. Dr. Liuzza stressed that both before and after January 25th, Miya was undergoing regular irrigation of the T-tube by syringe, which necessarily involved much greater interductal pressure than did the transfusion of platelets and therefore would be more likely to cause a blockage. However, there was no evidence that a blockage had occurred. He also found no evidence of tissue damage around the T-tube, nor any evidence of a biliary obstruction. He explained that platelets going through the T-tube would first pass into the intestine, where there was already fecal matter, so that the platelets could not have done any harm. Dr. Liuzza testified that there was absolutely no factual support for the opinions of Drs. Kennedy and Shaker that the platelets could have caused or contributed to the perforation in Miya’s intestine. He explained that he could not imagine how platelets, which last only about 48 hours, could have travelled approximately 25 feet to the sigmoid colon without having been totally destroyed on the way; nor could he fathom how platelets could have caused any harm whatsoever. He reiterated Dr. Singleton’s testimony that intestinal perforation is a known complication of HLH. He also found from the medical records, as did Dr. Singleton, that enterococcus bacteria, which caused |2iiMiya to go into septic shock, was present in her system on January 23rd. Dr. Liuzza noted that the fact that Miya experienced pain during or after the January 25th incident, especially considering that she also had pain before it, did not mean that the transfusion had caused the pain. In summary, Dr. Liuzza did not believe the January 25th incident “made any contribution at all to suffering, death or ány of the other problems [Miya] had.”
Considering all the evidence de novo, we conclude that the plaintiffs failed to prove by a preponderance of the evidence that the January 25th breach of the standard of care caused Miya to lose a chance of great *1279 er survival. Specifically, we note that our comparison of the credentials of the four doctors who testified on behalf of the defendant with those of the two doctors who testified on behalf of the plaintiffs played a role in our placing more weight on the defendants’ experts. As this court has stated, an expert’s qualifications and experience, as well as the facts, determine the weight to be given the expert’s testimony. Descant v. Administrators of Tulane Educ. Fund, 95-2127, p. 16 (La.App. 4 Cir. 1/21/98), 706 So.2d 618, 628.
In this instance, Dr. Kennedy’s testimony was less persuasive in light of the fact that he is an emergency room physician who admitted he had no experience treating HLH, and that he had only reviewed a portion of Miya’s medical chart. By contrast, Dr. Singleton’s testimony was highly persuasive in view of her specialized expertise and her experience in the treatment of HLH, as well, as her status as Miya’s treating physician. This court has also held that the testimony of a treating physician should be accorded more weight and probative value than that of doctors who have only seen the injured party (or, as here, merely reviewed the deceased party’s medical records) for purposes of rendering expert testimony. Richard v. Parish Anesthesia Associates, Ltd., 2012-0513, p. 21 (La.App. 4 Cir. 12/14/12), 106 So.3d 730, 742-43, writ denied, 2013-0116 (La.3/1/13), 108 So.3d 1179.
We also found Dr. Minor’s testimony to be persuasive in view of his experience with liver transplant patients. With regard to the pathologists, we note that at the time of trial, Dr. Liiizza, who had both practiced' and taught pathology since the 1980’s, had at least twenty more years of experience than Dr. Shaker, who did not obtain his United States board certification in forensic pathology until 2008, the year after Miya died.
The most important factor in our finding that the plaintiffs failed to prove causation, however, is the absence of any medical evidence to support the theories of causation propounded by Drs. Kennedy and Shaker. In fact, the medical evidence refutes those theories. Dr. Kennedy’s theory that the January 25th transfusion caused the “introduction of pathogenic bacteria” into Miya’s bloodstream is contradicted by the fact that the platelets given in that transfusion were sterile, which Dr. Kennedy himself admitted, and therefore could not have contained the enterococcus bacteria that caused Miya’s final sepsis. Similarly, Dr. Shaker’s theory that the transfusion of platelets through the T-tube caused a biliary obstruction is refuted by the evidence showing that Miya’s bilirubin was never elevated, as would have been the case if she had developed such an obstruction; nor was there any stoppage or slowing of the I.V. drip during the transfusion.
Accordingly, considering all the evidence including the expert testimony, we conclude that the plaintiffs failed to meet their burden of proof as to causation. In light of this conclusion, we pretermit the plaintiffs’ assignment of error as to damages.
_|2gDECREE
For the reasons stated, the judgment of the trial court is affirmed..
AFFIRMED.
*1280 [[Image here]]
*1281 [[Image here]]
*1282 [[Image here]]
*1283 [[Image here]]
*1284 [[Image here]]

. Miya was profoundly neutropenic and severely immunocompromised, which means that her body had virtually no ability to fight off infections.

. Following her liver transplant, Miya had both a T-tube to allow drainage of bile and access to the biliary ducts connected to her liver, and a central intravenous port to allow the infusion of platelets and medications directly into her bloodstream.

.According to the record, Children’s Hospital did not file a writ application seeking review of the March 14, 2011 interlocutory judgment denying the exceptions.

. The platelets infused into Miya on January 7th were obtained by Children’s Hospital from an outside blood bank.

. A copy of the signed verdict form is attached to this opinion as Appendix I.

. 405 So.2d 555 (La.App. 4th Cir.1981), aff'd 430 So.2d 16 (La.1982).

. 2001-1859 (La.App. 4 Cir. 11/6/02), 833 So.2d 999.

. La. C.C.P. art. 1812 provides, in pertinent part:
A. The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact.... The court shall give to the jury such explanation and instruction concerning the matter submitted as may be necessary to enable the jury to make its findings upon each issue....
[[Image here]]
C. In cases to recover damages for injury, death, or loss, the court at the request of any party shall submit to the jury special written questions inquiring as to:
(1) Whether a party from whom damages are claimed, or the person for whom such party is legally responsible, was at fault, and, if so:
(a) Whether such fault was a legal cause of the damages, and, if so:
(b) The degree of such fault, expressed in percentage.
[[Image here]]
(4) The total amount of special damages and the total amount of general damages sustained as a result of the injury, death, or loss, expressed in dollars, and, if appropriate, the total amount of exemplary damages to be awarded.
D. The court shall then enter judgment in conformity with the jury's answers to these special questions and according to applicable law.

. This court’s jurisprudence reflects that a case affected by legal error should be remanded for a new trial "[o]nly when a view of the witnesses is essential to a fair resolution of conflicting evidence.” Estate of Cristadoro ex rel. Jones v. Gold-Kist, Inc., 2001-0026, p. 27 (La.App. 4 Cir. 1/23/02), 819 So.2d 1034, 1050, as clarified on reh'g (Apr. 17, 2002) (emphasis in the original).

. The record reflects that Dr. Singleton was employed by LSU, not Children's Hospital, at the time she treated Miya.

. The record reflects that Miya's mother signed consent forms for this transfusion.

. In this case, Children's Hospital performed a blood culture on a sample of the blood used in the transfusion, which showed bacterial growth of fifteen colonies (an amount Drs. Singleton and Minor described as "insignificant”) on the day after the January 7th transfusion. However, seven subsequent cultures of Miya’s own blood taken between January 8th and January 23rd showed no bacterial contamination or infection.

. Dr. Kennedy testified by video deposition.

. Dr. Correa testified by video deposition.

. Fulminant hepatic necrosis is acute liver failure.

. Although the January 7th incident is not at issue here, we note that enterococcus was not the type of bacteria that showed up in the five-day culture of the blood given to Miya on January 7th.