LANDRIEU, J.,
concurs in part and dissents in part.
|tI concur in the opinion of the majority insofar as it finds that the plaintiffs have not established a cause of action for civil rights damages under 42 U.S.C. § 1983 and that therefore, the trial court erred by denying the exception of no cause of action filed by DHH. I also concur in the majority’s finding as to the application of the statutory cap on damages against the State defendants pursuant to Louisiana Revised Statute 13:5106. On these issues, I agree with the reasoning and conclusions of the majority, and join in reversing the judgment of the trial court.
Appellants raise four additional issues: 1) whether the jury erred in finding that DHH had the authority to release Mr. Harper without a court order; 2) whether the jury committed manifest error in failing to allocate fault to other parties; 3) whether the jury committed manifest error “in finding DHH liable for the entire period of Mr. Harper’s alleged illegal confinement;” and 4) whether the jury erred in awarding individual damages to Mr. Harper’s children in light of its finding that the actions of the State defendants did not cause Mr. Harper’s death. On the first three of these, I concur with the majority but deviate from the majority on the award of separate damages for loss of consortium.
|⅞1 will address each of these additional four issues in turn but first. discuss the jury interrogatories, which I believe resulted in the jury rendering an inconsistent verdict. The jury was presented with a set of interrogatories that were both confusing and inaccurate. Individual questions were poorly articulated in light of the facts arid applicable law, the questions did not follow the proper duty/risk analysis, and the instructions throughout the interrogatories failed to properly direct the jury through its deliberative process. This resulted in the jury returning answers that were inconsistent with each other and made it impossible for the trial court to “enter judgment' in conformity with the jury’s answers to these special questions and according to applicable law.” See, La. C.C.P. art. 1812 D (emphasis supplied). Pursuant'to 'Code of Civil Procedure article 1813 E, the inconsistencies in the jury’s responses required the trial court to either “return the jury for further consideration of its ariswers or ... order a new trial.” See Banks v. Children’s Hospital, 13-1481, pp. 10-13 (La.App. 4 Cir. 12/17/14), 156 So.3d 1263, 1270-72.
The record before us reflects an emotionally-charged trial on the merits. Counsel for the plaintiffs expressed justifiable frustration with the manner in which Mr. Harper was “lost in the system,” and counsel for the State understandably was troubled by the lack of clarity as to whose duty it was, at various points during Mr. Harper’s confinement, to determine when and whether to release Mr. Harper. At the close of a difficult trial, counsel and the court engaged in lengthy discussions, outside the presence of the jury, regarding both the jury charges and jury interrogatories. It is unclear from the record whether there was ultimate agreement on these issues, but neither party specifically raises the charges or interrogatories as assignments of error. In my view, howev *500 er, the errors in the jury interrogatories are inextricably linked to the assignments of error raised by the defendants on appeal.
| sIn its recitation of the facts, the majority correctly notes that Mr. Harper was found not guilty by reason of insanity in August of 1985, The majority then jumps to 1989, as did the plaintiffs in them presentation of the evidence. It is undisputed that Mr. Harper was housed at Orleans Parish Prison and in the physical custody of the Orleans Parish Sheriff (OPSO) during this four-year time period. It is also undisputed that DHH operated a program housed in OPP that was called the Orleans Inmate. Treatment Services Program (OITS), which was designed to provide mental health treatment for inmates. Plaintiffs contend that Mr. Harper was in OITS and therefore was the responsibility of DHH for these four years; conversely, the defense contends he was in the care of OPSO. This crucial issue was never resolved in the trial court.
On August 24, 1989, the trial court rendered judgment, which stated the court’s finding that Mr. Harper was not a danger to himself or to others and authorized his release on the condition that OITS “find a halfway house for the defendant and/or apply for welfare and social security.” DHH, the operator of OITS, did not challenge this responsibility. In a December 29, 1989 judgment, the trial court ordered Mr. Harper “to be released once suitable living arrangements can be made by his attorney.” Despite these orders, Mr. Harper remained in OPSO until 1990, when he was transferred tó the Feliciana Forensic Facility. Later, in 1992, Feliciana Forensic. Facility requested that the court allow weekend excursion passes in furtherance of its efforts to deinstitutionalize Mr. Harper. This request was denied. Mr. Harper was ultimately released in 1997.
These facts, which are properly recited by the majority, are reiterated here to illustrate the multiple errors in the jury interrogatories, which I believe led to the errors raised on appeal. The first five interrogatories the jury was asked to consider and their answers to these are, .as follows:
|41. Did the State of Louisiana through DHH (OITS Program) or Orleans Parish Sheriffs Office have any control over the release of inmates during the period August 14, 1985 through January 22,1997?
YES_X_No_
(Note: If your answer is ‘Tes,” proceed to Question 2; if your answer is “No,” proceed to Question 2.)
2. Did DHH have the authority to release Willie Harper without a court order during the period August 14, 1985 through January 22,1997?
YES_X_No____
(Note: If your answer is ‘Tes,” proceed to Question 3; if your answer is “No,” proceed to Question 3.)
3. Did DHH have the authority to release Willie Harper with a court order during the period August 14, 1985 through January 22,1997?
YES_X_No_
(Note: If your answer is ‘Tes,” proceed to Question 4; if your answer is “No,” proceed to Question 4.)
4. Did the State of Louisiana through DHH (OITS Program) or Orleans Parish Sheriffs Office have a duty during, the period August 14, 1985 through January 22, 1997 to release Willie Harper from custody?
YES_X_No_
(Note: If your answer is ‘Tes,” proceed to Question 5; if your answer is “No,” proceed to Question 8.)
*501 5. Did the State of Louisiana through DHH (OITS Program) or Orleans Parish Sheriffs Office breach a duty during the period August 14, 1985 through January 22, 1997 to Willie Harper by not releasing him from custody?
YES_X_No_
(Note: If your answer is ‘Yes,” pro-•eeed to Question 6; if your answer is “No,” proceed to Question 8.)
Each of these questions defines Mr. Harper’s alleged “illegal” confinement as being between August of 1985 (his NGR’I finding) and January of 1997 (his final release from custody). The first interro'g-atory asks whether two separate legal entities had any control over the release of inmates during this' entire time period. This question is irrelevant to the duty, if any, that each defendant owed to Mr. Harper Specifically.- Interrogatories two and three are directed to the duty of DHH (not OPSO), and interrogatories four and five then return to the duty of DHH or OPSO.
First and foremost, the question of duty is a legal one not ordinarily presented to the jury for its consideration, as discussed more fully below. Second, the interrogatories set Mr. Harper’s period of “illegal” confinement from the date of his NGRI verdict until his release and ask whether DHH or OPSO had a duty to release him during this period. Pretermitting the question of whether the jury | ^should have been afforded an opportunity to decide whether Mr. Harper was “illegally” confined at all, and if so, for how long, the questions do not distinguish between the time periods when Mr. Harper was in the custody of DHH and those when he was in the custody of OPSO, even though the record is void of any evidence that Mr. Harper was in OPSO custody after the first four years of his confinement. Third, DHH and OPSO are separate legal entities. It was error for the jury to not have been asked about the fault of each of these entities separately, whether Mr. Harper sustained any damages, ■ and, if so, each entity’s respective degree of fault;, expressed in percentages. La. C.C.P. art. 1812.
Jury ihterrogatory six and the jury’s answer to it are as follows:
6. Did the actions and/or inactions of the Orleans Parish Criminal Court judges and staff, the Orleans Parish Criminal Clerk of Court and its staff, the Orleans Parish Sheriffs Officé, ' State of Louisiana through DHH (OITS Program), Charles Foti, Jr., the Indigent Defender Attorneys and/or Willie Harper constitute an independent intervening cause of Willie" ' Harper’s alleged injury during the period August 14, 1985 through January 22,1997?
YES..... No _X_
(Note: If your answer is ‘Yes,” proceed to Question 7;, if your answer is “No,” proceed to Question 8.)
This interrogatory directs the jury to determine whether the actions of several entities “constitute^] an independent intervening cause of Willie Harper’s alleged injury during the period August 14, 1985 through January 22, 1997.” (Emphasis added) The jury answered “No” to .this interrogatory and was, therefore instructed to skip interrogatory seven and proceed to number eight.
There are two significant errors here. First, at this point in its deliberations, the-jury had not yet determined whether Mr. Harper had sustained an injury at all. Additionally, both DHH and OPSO were included in interrogatory six, even though the jury had already determined that they each owed a duty to Mr. Harper that they breached. Interrogatory seven listed all *502 of these entities mentioned in interrogatory six and directed the jury to state the percentage of fault it would allocate to each. However, because the jury had answered “No” to number six, it |flskipped interrogatory number seven, as directed. The result is that the jury failed to allocate fault among any of the entities, particularly among DHH and OPSO.
Lastly, the jury interrogatory instructions directed the jury to skip interrogatories twelve, thirteen, and fourteen and proceed to fifteen if it had answered “No” to interrogatory eleven. Interrogatory eleven is similar to six, which asked whether the actions of certain entities “constituted an independent intervening cause of Willie Harper’s alleged injury ” during his period of confinement. Interrogatory eleven asked whether the actions of these same entities “constitute[d] an independent, intervening cause of Willie Harper’s detainment ” during the same time period. Interrogatory twelve was designed, as was seven, to have the jury allocate fault pursuant to Civil Code article 2323. Because the jury had answered “No” to interrogatory eleven, it proceeded to interrogatory fifteen as directed. This incorrect direction caused the jury to skip questions thirteen and fourteen:
13. Was DHH exercising or performing, or failing to exercise or perform policy making or discretionary acts within the course and scope of their lawful powers and duties
YES_No_
(Note: If your answer is “Yes,” proceed to Question 14; if your answer is “No,” proceed to Question 15.)..
14. Do you find that the defendant’s wrongful acts violated Willie Harper’s civil rights
YES_No_
(Note: If your answer is “Yes,” proceed to Question 15; if your answer is “No,” proceed to Question 15.)
Despite having skipped interrogatory fourteen, however, the jury went on to award civil rights damages.[1]
In my opinion, these errors in the interrogatories presented to the jury undoubtedly affected the verdict, and, in the absence of other reversible legal error, 17require de novo review on appeal. See, Niklaus v. Bellina, 96-2411, p. 7 (La.App. 4 Cir. 5/21/97), 696 So.2d 120, 124; Banks v. Children’s Hospital, supra, at 13, 156 So.3d at 1272; Ferrell v. Fireman’s Fund Ins. Co., 94-1252, p. 7 (La.2/20/95), 650 So.2d 742, 747; Gonzales v. Xerox, 254 La. 182, 320 So.2d 163, 165 (1975).
Louisiana Code of Criminal Procedure article 654 et seq., sets forth the statutory scheme for the care and supervision of those citizens charged with a crime and found not guilty by reason of insanity. A review of the laws in other States indicates that .the Louisiana statutory scheme is similar to most: the State agency responsible for the care of persons criminally charged and found not guilty by reason of insanity may not release that inmate from custody without a court order authorizing it to do so.[2] This issue is a legal one that should have been decided by the trial court and not presented to the jury for its consideration. Applying a standard of de novo review,[3]1 concur with the majority’s *503 reversal of the jury’s finding that DHH had the authority to release Mr. Harper without a court order.
I find, nonetheless, sufficient facts in the record to support the existence of a duty on the part of DHH as to Mr. Harper and a breach of that duty. While I agree with Judge Dysart that the statutory scheme for the care and supervision of citizens found not guilty of a non-capital crime by reason of insanity places no duty upon DHH to secure a defendant’s release from custody, I find that under the particular circumstances of this case, DHH had a legal duty to Mr. Harper, which duty was breached.
The evidence shows that while Mr. Harper was housed at OPP, DHH participated in Mr. Harper’s care through its OITS program at OPP. Dr. Ciro |8Juarez-Nu-nez, one of the two treating psychiatrists for OITS, testified that he wrote a letter in December 1989 to Judge Waltzer of the Criminal District Court regarding an evaluation he performed as to Mr. Harper’s competency. The letter stated that Mr. Harper had been evaluated for competency at the OITS Center at OPP and had demonstrated his functional capacity to understand the proceedings against him and to assist in his defense. As noted by the majority, Dr. Juarez-Nunez testified that once someone is found not guilty by reason of insanity, that person is placed in the custody of the State, through DHH, even though the person is housed in OPP.
Mr. Larry Turner, the manager of the OITS program for a period of time during Mr. Harper’s confinement, testified that OITS was a DHH program. He testified that mentally ill prisoners in the OITS program received medication through DHH. After a determination in August 1989 that Mr. Harper was not a danger to himself or others, Judge Waltzer rendered judgment authorizing his release, conditioned upon OITS finding a halfway house for Mr. Harper and/or assisting him in applying for benefits. Those conditions were imposed by the trial court because Mr. Harper was without a place to live and had no apparent means of supporting himself. Mr. Turner acknowledged in his testimony that the trial court asked him to find Mr. Harper a place in a group home. In response to Judge Waltzer’s judgment, Mr. Turner made only a minimal effort to find a halfway house for Mr. Harper. He testified that he looked into one group home for possible placement of Mr. Harper and was told by that home that Mr. Harper did not meet its criteria for placement. Mr. Turner made no further efforts to find suitable housing for Mr. Harper, and no one with DHH attempted to contact Mr. Harper’s adult children or any other members of his family to find out if they could help. When asked at trial whether he had taken any further action after the group home [9he contacted had indicated that it could not accommodate Mr. Harper, Mr. Turner replied: “That wasn’t my purview.”
The record supports the finding that DHH had at least shared responsibility for Mr. Harper during his time at OPP (1985— 1989) through the DHH program, OITS. During this time period, Mr. Harper was under its direct care, and at no time did anyone with OITS make any effort to bring Mr. Harper to the attention of the trial court or make any effort toward his deinstitutionalization, despite the lack of any evidence that he was a danger to himself or others. From 1990 until his release in 1997, Mr. Harper was in the sole care of DHH. For the reasons stated by Judge Lobrano in her concurrence, I find that DHH breached its duty to Mr. Harper from 1990 to 1997 by failing to fulfill the conditions of his release as ordered by the court. I concur with the majority that *504 DHH is thirty-five percent (35%) at fault for the damages sustained by Mr. Harper.
I further concur with the majority in its findings of comparative fault on the part of ' OPSO, the Orleans Indigent Defender Program and the Criminal District Court. From 1985-1989, Mr. Harper was in the physical custody of OPSO. Yet there is nothing in the record to suggest that OPSO was aware than Mr. Harper was in its facility and nothing to indicate that OIDP, charged with the representation of Mr. Harper, did anything to secure for him the hearing to which he was entitled. It is inhumane for a person, especially one found to be mentally disabled, to be in custody for four years without having been sentenced.' I also concur with the majority that the Criminal District Court was negligent in closing Mr. Harper’s case record before his ease was properly and completely adjudicated. The criminal justice system is comprised of many different entities, each with its own duties and responsibilities for those arrested, from the time of arrest to final adjudication, sentencing and release. All must work together to ensure that the rights of these citizens are protected and that their treatment and/or sentencing comports with the |1floath elected and non-elected officials take: to uphold the laws of the State of Louisiana, to uphold and defend the Constitution of the State of Louisiana and the Constitution of the United States,- and to “faithfully discharge and perform” all of the duties of the office for which the official has responsibility. I concur in the majority’s allocation of-fault to these entities.
Finally, I dissent from -the majority’s finding that the record is void of sufficient evidence to support a loss of consortium award to Mr. Harper’s children. After Mr. Harper and his former wife separated when their children were minors, the contact the children had with' their father gradually became less frequent. The evidence of Mr. Harper’s mental evaluations shows that his mental illness impacted his relationship with his children.
Although Sharon was a young adult and Michael was a teenager when Mr. Harper was initially sent to OPP, both were adults in 1989 when the Criminal Court judge authorized Mr. Harper to be released on the condition that OITS locate suitable housing for him and/or assist him in applying for benefits. As noted above, Mr. Turner, of OITS, testified that that he contacted one group home to try to place Mr. Harper, but made no other efforts after that group home determined that Mr. Harper did not meet the criteria to live there. There is no evidence that Mr. Turner or anyone else in the criminal justice system attempted to contact either of Mr. Harper’s adult children in the quest to find suitable housing for him. When questioned at trial as to whether he asked Mr. Harper if he had any relatives with whom he could live, Mr. Turner replied, “I’ve never seen Willie Harper.” Many years went by before Sharon and Michael learned that their father was in the Felici-ana Forensic Facility. Michael testified that he did not learn that fact until around 1995, and Sharon testified that “years and years” had passed by the time she found out.
In As a result of not being contacted and given the opportunity to help their father when he was in need of housing in 1989, and then not learning that their father was in Feliciana Forensic Facility until approximately 1995, Sharon and Michael were deprived of the chance to have a closer relationship with their father as adults. Accordingly, while I find excessive the jury’s award of $275,000.00 each to Sharon and Michael for loss of consortium, I disagree with the majority that Sharon and Michael failed to prove that they suffered *505 any measurable and compensable loss. I would award Sharon and Michael each the sum of $25,000.00 for loss of consortium, reduced by the percentage of fault not attributable to DHH and subject to the statutory cap on damages pursuant to La. R.S. 13:5106.

. As stated previously, I agree with the majority's finding that civil rights damages are precluded as a matter of law.

. The four states that do not require court authorization are Indiana, Massachusetts, Michigan and Oregon,

.I do not reach the issue of whether the quantum of damages should be reviewed de novo or under the manifestly erroneous standard because the application of the statutory cap renders the issue moot.