MADELEINE M. LANDRIEU, Judge.
| defendants, Clariant Corporation and Ford Motor Company (“Ford”), suspen-sively appeal the judgment rendered against them in favor of the plaintiffs following trial of this wrongful death/survival action based upon the death of William Oddo, Jr., from mesothelioma.
FACTS AND PROCEEDINGS BELOW
On June 3, 2011, Mr. Oddo filed the instant action against multiple defendants alleging they were liable for damages he suffered when he contracted mesothelioma as a result of exposure to asbestos during his lifetime. Mr. Oddo was eighty-one years old when he was diagnosed with mesothelioma in 2011. He died from the disease on August 23, 2011, approximately two months after the filing of his petition. On September 16, 2011, Mr. Oddo’s suit was converted to a survival/wrongful death action brought by his wife, Doris Oddo, and two sons, William Oddo, III, and Steven Oddo.
Mr. Oddo’s petition and his deposition testimony (taken one month before his death and introduced at trial), established that during his lifetime, he had potential occupational exposure to asbestos at multiple jobs, as well as possible presidential exposure during a time when he lived on the westbank of Jefferson Parish. His alleged occupational exposures include working in a shipyard for (“Higgins”) between 1947 and 1954; working as an appliance repairman for Westinghouse Electric in the late 1950s; working on diesel truck rigs for Cummins Sales & Services (“Cum-mins”) in the 1960s; working for Lummis as an insulator at a Union Carbide plant in 1966 to 1967; and working as an automobile mechanic for the Jefferson Parish Sheriffs Office (“JPSO”) from 1972 until 1996. Mr. Oddo’s alleged residential exposure was attributed to his having lived for part of his life near Johns-Manville plants that produced asbestos-containing products and in particular, having lived for one year (from 1972 until 1973) in a home with a driveway composed of fill from leftover scraps of asbestos-containing products (cement and roofing materials) from Johns-Manville. It was also established that Mr. Oddo had been diagnosed with asbestosis years before his diagnosis of mesothelio-ma. In 1994, Mr. Oddo filed a lawsuit against multiple defendants alleging they *1198 were liable for damages related to his asbestosis.
After many of the named defendants in the instant case had settled and/or been dismissed, the matter was tried to a jury against the remaining two defendants, Ford and Sud-Chemie, Inc. (formerly known as Southern Talc Company). Clari-ant Corporation, one of the two appellants here, is the successor of Sud-Chemie, Inc./Southern Talc Company.[1] For purposes of clarity, Clariant Corporation will hereinafter be referred to as “Southern Talc.”
At trial, the plaintiffs sought to prove that exposure to Ford products was a legal cause of Mr. Oddo’s mesothelioma and resulting death because Mr. Oddo |swas exposed to brake dust while repairing Ford vehicles during the twenty-four years he worked as an auto mechanic for the JPSO. They also sought to prove that exposure to Southern Talc’s product had substantially contributed to Mr. Oddo’s mesothelioma and resulting death because allegedly asbestos-containing talc sold by Southern Talc to Johns-Manville was present in the fill that composed the driveway of the house Mr. Oddo lived in from 1972 to 1973, exposing Mr. Oddo to talc dust whenever he raked or mowed over the driveway.
The trial began on November 26, 2012, and lasted approximately two weeks. Fact witnesses (in addition to Mr. Oddo, whose videotaped deposition testimony was played for the jury) included Mr. Oddo’s two sons, William and Steven; his stepdaughter, Sandra Guidroz; and his former coworker at JPSO, Ronald Coates (by deposition). Additional fact witnesses included the corporate representative of Southern Talc, Marian Cochran; and that of Ford, Mark Taylor; as well as the former owner of Southern Talc, Woody Glen (by deposition). Also introduced was the testimony of seven expert witnesses. Dr. Samuel Hammar, a pathologist; Dr. Murray Finkelstein, an expert in epidemiology; and Dr. Joseph Guth, a chemist and industrial hygienist, testified for the plaintiffs. Dr. Mark Roberts, an expert in epidemiology, occupational and environmental medicine; Dr. Michael Graham, a pathologist; Dr. James Crapo, a pulmonol-ogist (by deposition); and Dr. Bryan Hardin, an expert in toxicology and public health, testified for the defendants. After the plaintiffs presented their evidence, Ford and Southern Talc each moved for a directed verdict. Both motions were denied.
14At the conclusion of trial, the jury was given a special verdict form composed of twelve interrogatories.[2] In accordance with the applicable law, the interrogatories questioned the jury as to the liability of Ford and Southern Talc, as well as to the liability of nine “empty chair” defendants not represented at trial, namely: (1) Lum-mis; (2) Union Carbide; (3) Westinghouse; (4) Bendix; (5) JPSO; (6) Johns-Manville; (7) Wego Auto Parts; (8) Higgins; and (9) Cummins.[3]
*1199 The jury’s findings in response to the interrogatories are summarized as follows:
(1) Both Ford and Southern Talc manufactured or were professional vendors of asbestos-containing products. (Interrogatory No. 1)
(2) Mr. Oddo was exposed to asbestos-containing products from both Ford and Southern Talc. (Interrogatory No. 2)
(3).Mr. Oddo’s exposure to asbestos-containing products from Ford was a substantial contributing cause of his mesothelioma. His exposure to asbestos-containing products from Southern Talc was not a substantial contributing cause of his mesothelio-ma. (Interrogatory No. 3)
(4) Ford and Southern Talc were negligent. Also negligent were six (of the nine) nonparties listed on the verdict form: Union Carbide, Bendix, JPSO, Johns-Manville, Higgins and Cummins. (Interrogatory No. 7)
h(5) The negligence of Ford, Southern Talc and the aforementioned six nonparties was a substantial contributing cause of Mr. Oddo’s meso-thelioma. (Interrogatory No. 8)
(6)The percentage of negligence or fault assigned to each defendant was: sixty-five percent (65%) to Ford, thirty-five percent (35%) to Southern Talc, and zero percent (0%) to each of the six aforementioned nonparties. (Interrogatory No. 10)
(7) Mr. Oddo was not at fault. (Interrogatory No. 9)
(8) The total amount of compensation owed the plaintiffs for damages Mr. Oddo suffered prior to his death, including medical expenses (survival damages), is $2,301,393.15. (Interrogatory No. 11)[4]
(9) The total amount of compensation owed the plaintiffs for damages they sustained as a result of Mr. Oddo’s death (wrongful death damages) is $2,100,000.00 ($900,000.00 to Doris Oddo, and $600,000.00 each to William Oddo, III, and Steven Oddo). (Interrogatory No. 12)
After considering this jury verdict, the trial court on January 8, 2013 rendered judgment without written reasons, awarding a total of $4,401,393.15 in favor of the plaintiffs. This award consisted of:
• Survival damages:
• $460,278.62 against Ford, and
• $460,278.62 against Southern Talc.
• According to the judgment, these amounts represented the virile share of each defendant “based upon the number of entities for whom the | ftjury found liability, which was a substantial contributing cause of the Decedent’s meso-thelioma (5).”[5]
• These amounts were awarded with legal interest from June 3, 2011, the date the original petition was filed, until paid.
• Wrongful death damages—
• Against Ford:
• $585,000.00 to Doris Oddo, and
*1200 • $390,000.00 to each of Mr. Oddo’s two sons.
• These amounts represented sixty-five percent (65%) of the wrongful death damages found by the jury, in accordance with Ford’s percentage of fault.
• These amounts were awarded with legal interest from September 16, 2011, the date the petition was amended to include the wrongful death claim, until paid.
• Against Southern Talc:
• $315,000.00 to Doris Oddo, and
• $210,000.00 to each of Mr. Oddo’s two sons.
• These amounts represent thirty-five percent (35%) of the wrongful death damages found by the jury, in accordance with Southern Talc’s percentage of fault.
• These amounts were also awarded with legal interest from September 16, 2011 until paid.
17Ford and Southern Talc filed motions for new trial in which they contended the trial court had erred by entering judgment despite an inconsistent jury verdict. Both defendants also filed motions for judgment notwithstanding the verdict.[6] After hearing the post-trial motions, the trial court denied them without written reasons on September 3, 2013. This suspensive appeal followed. On appeal, Ford argues that the jury erred by finding that exposure to Ford products was a substantial contributing cause of Mr. Oddo’s mesothe-lioma. Ford also raises assignments of error as to two evidentiary rulings by the trial court: (1) the exclusion of certain trust claim forms filed by Mr. Oddo in an attempt to recover from seven asbestos bankruptcy trusts; and (2) the acceptance of two of the plaintiffs’ witnesses, Drs. Hammar and Finkelstein, as experts following a pretrial Daubert hearing. Finally, Ford raises as legal error the trial court’s entry of judgment based upon inconsistent jury findings.
Southern Talc also contends the trial court committed legal error by entering judgment based upon inconsistent jury findings, rather than sending the jury back for reconsideration of its answers or ordering a new trial. In addition, Southern Talc argues on appeal that the jury was clearly wrong in finding that Southern Talc manufactured an asbestos-containing product and/or that Mr. Oddo was exposed to an asbestos-containing product of Southern Talc.
Because it affects our standard of review, we first consider the issue raised by both appellants regarding the trial court’s commission of a legal error by entering judgment despite the jury’s having returned irreconcilably inconsistent ^responses to the interrogatories posed by the special verdict form. See La. C.C.P. art. 1813.
I. ENTRY OF VERDICT DESPITE INCONSISTENT JURY FINDINGS
Special verdict forms are governed by Louisiana Code of Civil Procedure articles 1812 and 1813. Article 1812 addresses the form and content of certain special verdict forms.[7]
| sArticle 1813 states:
*1201 A. The court may submit to the jury, together with appropriate forms or a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict. The court shall give such explanation or instruction as may be necessary to enable the jury both to make answers to the interrogatories and to render a general verdict....
B. The court shall inform the parties within a reasonable time prior to their arguments to the jury of the general verdict form and instructions it intends to submit to the jury, and the parties shall be given a reasonable opportunity to make objections.
C. When the general verdict and the answers are harmonious, the court shall direct the entry of the appropriate judgment upon the verdict and answers.
D. When the answers are consistent with each other but one or more is inconsistent with the general verdict, the court may direct the entry of judgment in accordance with the answers, notwithstanding the general verdict, or may return the jury for further consideration of its answers and verdict, or may order a new trial.
E. When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, the court shall not direct the entry of judgment but may return the jury for further consideration of its answers or may order a new trial. (Emphasis supplied).
In this case the jury was presented with twelve interrogatories without being asked for a general verdict. Ford and Southern Talc contend that trial court erred by entering judgment because the *1202 jury’s answers to certain interrogatories are inconsistent with each other and also inconsistent with the general verdict rendered by the trial judge. The appellants further contend, as they did in their motions for new trial and for judgment notwithstanding the verdict, that when faced with the jury’s inconsistent factual findings, the trial court had only two options in accordance with Article 1813 E: to return the jury for reconsideration of its answers or to order a new trial. Because the trial court did neither, the appellants | incontend this court should remand for a new trial. Alternatively, the appellants contend this court should conduct a de novo review of the record and render its own, independent judgment without affording any deference to the jury findings.
The plaintiffs counter argue that the jury’s responses are not inconsistent, and alternatively, contend that even assuming the trial court erred by entering judgment, the appellants are at best entitled to de novo review by this court rather than a new trial.
We agree with the defendants that the jury’s responses on the special verdict form are irreconcilably inconsistent. The first problem is that the jury made conflicting findings as to the liability of Southern Talc. The jury responded to Interrogatory No. 3 that Mr. Oddo’s exposure to asbestos-containing products from Southern Talc was not a substantial contributing cause of his mesothelioma, but found in response to Interrogatory No. 8 that Southern Talc’s negligence was a substantial contributing cause of his mesothelioma. The jury then assigned 35% liability to Southern Talc (Interrogatory No. 10).
The two different responses as to causation directly conflict with one another. The plaintiffs assert that these responses are not inconsistent because Interrogatory No. 3 addresses causation in the context of strict liability, whereas Interrogatory No. 8 addresses causation in the context of general negligence. This assertion is legally incorrect. The applicable law in asbestos cases is well-settled. To prove liability of a manufacturer or professional vendor of an asbestos-containing product, the plaintiff must show “he had sufficient exposure to the In product complained of to the extent that it was a substantial factor in bringing about his injury.” Rando v. Anco Insulations, Inc., 2008-1163, 2008-1169, p. 35 (La.5/22/09), 16 So.3d 1065, 1091(citing Asbestos v. Bordelon, Inc., 96-0525, p. 30 (La.App. 4 Cir. 10/21/98), 726 So.2d 926, 948; Vodanovich v. A.P. Green Industries, Inc., 2003-1079, p. 4 (La.App. 4 Cir. 3/3/04), 869 So.2d 930, 933). This standard of proof, developed by Louisiana courts over years of asbestos litigation, is known as the “substantial factor” test. Id. Stated differently, the plaintiff must prove, by a preponderance of the evidence that: (1) his exposure to the defendant’s asbestos product was significant; and (2) that this exposure caused or was a substantial factor in bringing about his mesothelioma (or other asbestos-related disease). Robertson v. Doug Ashy Bldg. Materials, Inc., 2010-1551, p. 19 (La.App. 1 Cir. 10/4/11), 77 So.3d 360, 372 (citing Rando, 2008-1163, 2008-1169, p. 38, 16 So.3d at 1092).
In the case before us, the trial court judge obviously recognized this standard to be the applicable law in giving the jury instructions, as she recited the “substantial factor” test four times. This standard clearly governs the liability of Ford and Southern Talc, both of which were found by the jury to be manufacturers/professional vendors of asbestos-containing products in response to Interrogatory No. 1. Thus, the liability of either defendant depended upon whether the plaintiffs proved by a preponderance of the evidence that *1203 Mr. Oddo’s exposure to .that defendant’s product was a “substantial contributing cause” of his mesothelioma, the question posed by Interrogatory No. 3.
h;.Once the jury found in response to that question that exposure to Southern Talc’s product was not a substantial contributing cause of Mr. Oddo’s mesothelio-ma, there could be no liability on the part of Southern Talc. Accordingly, the jury should have been directed to stop answering questions with respect to any party for whom they had answered “No” to Interrogatory No. 3. The directions accompanying Interrogatory No. 3, however, instructed the jury to proceed to the next question if they had answered “Yes” as to either Ford or Southern Talc, and to stop only if they had answered “No” as to both companies. This instruction was wrong and undoubtedly misled the jury. Following this incorrect instruction, the jury proceeded to the next question as to both defendants.
The next three questions on the special verdict form (Interrogatory Nos. 4, 5 and 6), respectively, asked whether the products manufactured by Ford and/or Southern Talc were unreasonably dangerous in their design (No. 4); unreasonably dangerous due to a failure to warn (No. 5); or unreasonably dangerous per se (No. 6).[8] Interrogatory No. 7 then asked whether the jury found, by a preponderance of the evidence, that Ford, Southern Talc, or any of nine nonparties listed was negligent. We note that this question was appropriate as to the nonparties but not as to Ford and Southern Talc because the jury had already been asked questions |1swhich determined the liability or non-liability of Ford and Southern Talc.[9] Interrogatory No. 8 asked whether the negligence of any of these companies “was a substantial contributing cause of Mr. Oddo’s mesothelio-ma.” Ford and Southern Talc were incorrectly included in Interrogatory Nos. 7 and 8. The jury had already determined the liability of Ford and rejected the liability of Southern Talc in response to Interrogatory No. 3. The failure to limit these two questions to the nine nonparties, whose *1204 liability had not yet been addressed, was yet another error that likely misled the jury and contributed to the inconsistency in their answers with regard to Southern Talc.
The second inconsistency on the special verdict form is that the jury found the “negligence” of six of the nine “empty-chair” defendants to be a substantial contributing cause of Mr. Oddo’s mesothelio-ma (Interrogatory No. 8), but assigned zero percentage of fault to each of these six (Interrogatory No. 10). The jury’s responses to Interrogatory Nos. 8 and 10 pose an irreconcilable conflict and violate the law. As this court has previously stated, under La. C.C.P. art. 1812 C, the jury must attribute a percentage of fault to a party or nonparty that is negligent, if its | unegligence was a legal or proximate cause of the accident. Stevens v. Scottsdale Ins. Co., 95-2347, p. 3 (La.App. 4 Cir. 3/27/96), 672 So.2d 1031, 1033 (emphasis supplied; citing Ferrell v. Fireman’s Fund Ins. Co., 94-1252, p. 7 (La.2/20/95), 650 So.2d 742, 747).
There is no question that these inconsistencies made it impossible for the trial court to “enter judgment in conformity with the jury’s answers to these special questions and according to applicable law.” See La. C.C.P. art. 1812 D (emphasis supplied). Pursuant to La. C.C.P. art. 1813 E, the inconsistencies in the jury’s responses on the special verdict form required that the trial court take one of two actions: (1) return the jury for reconsideration of its answers; or (2) order a new trial. Specifically, Article 1813 E provides: “When the answers are inconsistent with each other and one or more is likewise inconsistent with the general verdict, the court shall not direct the entry of judgment but may return the jury for further consideration of its answers or may order a new trial.” (Emphasis supplied). In Palumbo v. Shapiro, 2011-0769 (La.App. 4 Cir. 12/14/11), 81 So.3d 923, and again in Banks v. Children’s Hospital, 2013-1481 (La.App. 4 Cir. 12/17/14), 156 So.3d 1263, we held that Article 1813 E applies to cases, such as the instant one, where the jury was asked to answer special interrogatories but not to render a general verdict. Palumbo, 2011-0769, p. 10, 81 So.3d at 929 (citing Ferrell, supra; Banks, 2013-1481, p. 9, 156 So.3d at 1270).
Just as in Banks, in the present case the jury’s answers are not only inconsistent with each other, but “one or more of the jury’s answers would have been inconsistent with any general verdict the trial court possibly could have rendered. [In addition] ... the jury’s inconsistent responses were undoubtedly |1saffected by misleading, and in some respects erroneous, directions printed on the special verdict form as to how to proceed in answering the interrogatories.” Banks, 2013-1481, p. 10, 156 So.3d at 1270. The trial court’s failure to send the jury back to reconsider its answers or to order new trial under these circumstances is a legal error that fatally interdicts the fact-finding process of the jury. See Palumbo, 2011-0769, p. 12, 81 So.3d at 930.
Both Ford and Southern Talc filed motions for new trial based upon this legal error of the trial court. As stated previously, because the trial court had not sent the jury back for reconsideration of its inconsistent answers, when presented with those motions, the trial court’s only remaining option under La. C.C.P. art. 1813 E was to order a new trial Accordingly, the trial court’s denial of the motions for new trial was legal error.
Ford and Southern Talc argue on appeal that that this legal error entitles them to a remand of this matter for a new trial, or alternatively, to de novo review of the record on appeal. The plaintiffs sub *1205 mit that, assuming we find the trial court’s entry of judgment to be legal error, we should not remand for a new trial but should review the facts in the record de novo and decide the issues affected by the jury inconsistencies without affording any deference to the jury’s findings.[10]
hfiWhen faced with a legal error that has tainted a jury verdict, the general rule is that where the record is “otherwise complete, the appellate court should make its own independent de novo review of the record to determine a preponderance of the evidence.” Evans v. Lungrin, 97-0541, pp. 6-7 (La.2/6/98), 708 So.2d 731, 735; Lam v. State Farm Mut. Auto. Ins. Co., 2005-1139, p. 3 (La.11/29/06), 946 So.2d 133, 135; Ullah, Inc. v. Lafayette Ins. Co., 2009-1566, p. 17 (La.App. 4 Cir. 12/17/10), 54 So.3d 1193, 1203. We have previously held that the trial court’s submission to the jury of “a verdict sheet which either confuses or misleads the jury,” constitutes reversible legal error that triggers de novo review. Niklaus v. Bellina, 96-2411, p. 7 (La.App. 4 Cir. 5/21/97), 696 So.2d 120, 124. The failure of the trial court to either send the jury back for further deliberations or order a new trial when presented with inconsistent findings on a special verdict form is another such legal error. Banks, 2013-1481, p. 10, 156 So.3d at 1270.
In the case before us, because we have a complete record on appeal, we find de novo review to be the appropriate remedy.[11] Applying de novo review, the appellate court independently views the record, without granting any deference to the trial court’s findings, to determine the preponderance of the evidence. Banks, 2013-1481, p. 13, 156 So.3d at 1272 (citing Ferrell, 94-1252, p. 7, 650 So.2d at 747; Gonzales v. Xerox Corp., 254 La. 182, 320 So.2d 163, 165 (1975)). Where, however, the legal error does not affect all the jury’s findings, the appellate court should confine its de novo review to only those findings-that have been interdicted by the |17error. Banks, 2013-1481, p. 13, 156 So.3d at 1272 (citing Picou v. Ferrara, 483 So.2d 915, 918 (La.1986); Lam, 2005-1139, p. 3, 946 So.2d at 135-36).
 In the case before us, the jury’s findings with regard to the liability of Southern Talc and the liability of the non-parties were tainted by inconsistencies. With regard to the liability of Ford and the finding of no fault on the part of Mr. Oddo, however, there were no inconsistent answers. In accordance with the above-cited law, therefore, we review the liability of Ford under the manifest error standard, *1206 but consider the liability of Southern Talc and of the nonparties pursuant to de novo review. Under de novo review, we then assign percentages of fault to each liable party and nonparty. The non-fault of Mr. Oddo is not assigned as error on appeal and therefore is not addressed by us. The jury’s answers quantifying the damages suffered by Mr. Oddo prior to his death and by his heirs as a result of his death (Interrogatory Nos. 11 and 12) likewise were not affected by the errors and/or inconsistencies on the special verdict form with respect to the liability issues. Moreover, no party raises the amount of damages awarded as an error on appeal. Accordingly, our review does not address damages.
II. LIABILITY OF SOUTHERN TALC
Southern Talc argues that the plaintiffs failed to prove by a preponderance of the evidence that exposure to its product, talc, was a substantial cause of Mr. Oddo’s mesothelioma. At all relevant time periods, Southern Talc owned and operated a talc mine near Chatsworth, Georgia. The plaintiffs’ theory of liability against Southern Talc is that from 1952 to 1962, Southern Talc sold talc to Johns-Manville, which operated three industrial plants on the Westbank of Jefferson Parish in Louisiana. One of those plants produced asphalt-based roofing products, and the other two produced asbestos-containing cement. Plaintiffs alleged that látale was used by Johns-Manville in the plant that produced roofing products to coat the backs of roofing tiles. From approximately 1955 to 1965, Johns-Manville had a practice of distributing fill composed of scraps and waste material from their three plants, free of charge, to westbank residents for use as paving material in driveways, yards and roads. From 1972 to 1973, Mr. Oddo lived at 518 Marion Avenue, which had a driveway composed of the Johns-Manville fill. The plaintiffs alleged that talc sold to Johns-Manville by Southern Talc was contaminated with tre-molite asbestos and was present in that driveway. They further alleged that Mr. Oddo was substantially exposed to this tremolite asbestos when he raked or mowed across the driveway and thereby disturbed the asbestos-contaminated talc. As stated previously, the jury found that exposure to Southern Talc’s product was not a substantial contributing cause of Mr. Oddo’s mesothelioma. Despite this finding, however, the jury proceeded to assign thirty-five percent (35%) fault to Southern Talc based upon its “negligence,” and the trial court awarded damages based upon this percentage of fault.
On appeal, Southern Talc asserts there was no evidence that its product was actually present in the driveway of the house on Marion Avenue during the one year Mr. Oddo lived there. Moreover, Southern Talc asserts that there was no evidence that talc extracted from its mine in Georgia contained tremolite during the relevant time period, nor any evidence that tremol-ite, the only type of asbestos allegedly present in talc, was present in Mr. Oddo’s driveway in 1972-1973.
On de novo review, we find that the plaintiffs failed to prove by a preponderance of the evidence that talc from Southern Talc’s mine was contained in the material that composed Mr. Oddo’s driveway at 518 Marion Avenue during the year he lived there. They also failed to show by a preponderance of the |19evidence that Mr. Oddo was exposed to an above-background level of asbestos from Southern Talc’s product.
Although plaintiffs allege Southern Talc sold talc to Johns-Manville from 1952 to 1962, the documentary evidence is limited *1207 to invoices and a corporate ledger containing a handwritten customer list that indicated sales to Johns-Manville from 1954 to 1958.[12] Mr. Oddo did not move into the house on Marion Avenue until 1972. He testified that the driveway was there when he moved in. Mr. Oddo’s son, William, testified that the house was probably built during the 1940s. William did not know when the driveway was put in but testified that he believed it had been there “long before” his father moved to the house. Mr. Oddo’s other son, Steven, similarly testified that he “had no idea” when the driveway was put in. There was no dispute, however, that the driveway was composed of Johns-Manville fill. The disputed issues at trial concerned whether talc or tremolite was present in the fill and/or in the driveway.
Mr. Oddo said the driveway appeared to be made of roofing scraps, which he believed contained asbestos. He did not mention talc or testify that there was talc in the driveway. His son, William, who had worked as a roofer, said he recognized some roofing materials in the driveway. He testified that he thought the driveway was composed of fifty to sixty percent crushed transite pipe. William also mentioned transite, asphalt and smooth roofing as being in the driveway mix and said he thought talc was used “to help keep that stuff from stinging [sic] together.” He then stated, however, that he did not really know what backing | ¡^material Johns-Man-ville used on its roofing products. William did not say that he observed talc in the driveway material. Steven Oddo indicated he had not known what the driveway was made of when his father lived on Marion Avenue, but he later learned it was composed of a roofing material “gumbo” from Johns-Manville.
Mr. Oddo’s driveway was never tested for the presence of talc or tremolite. The plaintiffs presented no testimony or evidence that the fill distributed by Johns-Manville to westbank residents contained talc. The plaintiffs’ expert in industrial hygiene, Dr. Guth, opined that talc is “often” contaminated by tremolite but admitted that he had seen no documentation of talc or tremolite being present in the Johns-Manville fill or in Mr. Oddo’s driveway. Dr. Guth also testified that there was no ¡evidence of tremolite in the products sold by Southern Talc in the 1950s and 1960s.[13] Neither of the plaintiffs’ other two experts, Dr. Hammar or Dr. Fink-elstein, addressed talc in his expert report. At trial, the testimony of both Dr. Ham-mar and Dr. Finkelstein as to causation was based upon a hypothetical in which they were asked to assume Mr. Oddo had received an above-background level of exposure to tremolite from talc present in his driveway. In that situation, both opined that Mr. Oddo’s exposure to the talc would be a contributing cause of Mr. Oddo’s *1208 mesothelioma. Dr. Hammar went on to say that if there was no testimony that Mr. Oddo was exposed to an above-background level of tremolite from talc in the driveway, he could not opine that exposure to talc caused his mesothelioma. Dr. Ham-mar also said it was probably true that talc sold from 19521 z1to 1962 had nothing to do with what was in the driveway in 1972. Dr. Finkelstein acknowledged that there was no study linking talc to mesothelioma and that there were no studies done on the talc extracted from Southern Talc’s Georgia mine during the relevant time period. Johns-Manville’s records indicated it had stopped using talc as backing for certain roofing products in 1962 and began using laminar instead.
Reviewing all the evidence, we conclude that the plaintiffs did not meet their initial burden of showing that Mr. Oddo was substantially exposed an asbestos-containing product from Southern Talc during the one year he lived on Marion Avenue. There is no expert testimony that talc contained in the driveway resulted in Mr. Oddo’s above-background exposure to asbestos. There is no direct evidence Southern Talc’s product was even present in the. driveway on Marion Avenue, and the circumstantial evidence is slight. For instance, there is no evidence that the driveway was put in during the time period (1952-1962) in which Southern Talc sold talc to Johns-Manville, only that it could have been. Johns-Manville continued to distribute fill for years after the alleged sales by Southern Talc, and Mr. Oddo did not move to Marion Avenue until ten years after those sales had stopped. Moreover, although there is ample evidence that the driveway was composed of Johns-Manville fill, there is no direct evidence that the fill used in that driveway, or any of the fill distributed to westbank residents at any time, contained talc or tremolite. No one from Johns-Manville testified as to the composition of the fill, nor were there any records introduced regarding its components. Because Johns-Manville operated three plants on the westbank |22during the relevant time period, and only one of these allegedly used talc, the plaintiffs had the burden of showing that talc was present in the fill distributed by Johns-Manville; that the talc in the fill was contaminated with tremolite; that this talc had been purchased from Southern Talc; and that this same talc was present in Mr. Oddo’s driveway. Tests done in the 1990s by the Environmental Protection Agency (“EPA”) on a sampling of the westbank driveways made of Johns-Manville fill indicated the presence of other types of asbestos (croci-dolite and chrysotile) but not tremolite.[14] Similarly, soil samples taken from 518 Marion Avenue by the EPA did not show any tremolite. The only evidence that talc was contained in the driveway was the testimony of Mr. Oddo’s son, William, a non-expert, who said he thought talc had been used to keep roofing materials from sticking together, but admitted that he did not know what Johns-Manville actually used.
Because the plaintiffs failed to show by a preponderance of the evidence that Mr. Oddo was exposed to Southern Talc’s product, Southern Talc is not at fault in causing Mr. Oddo’s mesothelioma. We therefore reverse the trial court’s judgment insofar as it assigns thirty-five percent (35%) liability to Southern Tale.
III. LIABILITY OF FORD
There were no inconsistencies in the jury’s responses as to Ford. This fact, coupled with our conclusion that the trial court committed legal error by denying *1209 Ford’s motion for new trial, warrants our review of the jury’s findings as to the liability of Ford under the manifest error standard.[15] We note, however, that Ford | asdoes not specifically contend on appeal that the jury’s findings were manifestly erroneous. Ford’s two assignments of error related to the jury’s finding of liability against it are: (1) the trial court erred by allowing the plaintiffs’ causation experts, Drs. Hammar and Finkelstein, to testify because their opinions lack a reliable scientific foundation; and (2) the trial court erred by denying Ford’s motion for judgment notwithstanding the verdict premised upon the assertion that neither of the aforementioned causation experts testified that exposure to Ford products (as opposed to performing brake work in general) was a substantial cause of Mr. Oddo’s mesothelioma.
The first of these assignments of error is essentially an argument by Ford that the trial court erred by denying its pretrial Daubert motion to exclude Drs. Hammar and. Finkelstein for failure to meet the standards set forth in Louisiana Code of Evidence article 702.[16] Article 702 provides:
A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(1)The expert’s scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(2) The testimony is based on sufficient facts or data;
(3) The testimony is the product of reliable principles and methods; and
| ¾(4) The expert has reliably applied the principles and methods to the facts of the case.
The specific basis for Ford’s Daubert motion was that the foundation of these experts’ opinions — that every exposure to asbestos is a cause of subsequently developed mesothelioma — is not based on scientifically reliable principles and methods, and as such has been rejected by the jurisprudence. At the conclusion of the Daubert hearing, the trial court agreed that this theory was not generally accepted as reliable. Rather than declining to qualify Drs. Hammar and Finkelstein as experts, however, the trial court limited their testimony. The court ruled that they would be allowed to testify only that all “above-background” or non-trivial exposures to asbestos are substantial contributing causes of mesothelioma. ’ This statement is within the ambit of the generally-accepted body of law developed in asbestos cases. See Landry v. Avondale Industries, Inc., 2012-0950, p. 6 (La.App. 4 Cir. 3/6/13), 111 So.3d 508, 511, wherein this court stated: “[E]very non-trivial exposure to asbestos contributes to and constitutes a *1210 cause of mesothelioma. This theory has been embraced in the Supreme Court's decision in Rando v. Anco Insulations, Inc., 08-1163, 08-1169 (La.5/22/09), 16 So.3d 1065.” See also, Francis v. Union Carbide Corp., 2012-1397, p. 7 (La.App. 4 Cir. 5/8/13), 116 So.3d 858, 862, writ denied, 2013-1321(La.9/20/13), 123 So.3d 177 (citing McAskill v. Am. Marine Holding Co., 2007-1445, pp. 7-8 (La.App. 4 Cir. 3/4/09), 9 So.3d 264, 268). At trial, even Ford’s own expert, Dr. Michael Graham, testified that every above-background exposure to asbestos contributes to the development of mesothelioma.
A trial court has broad discretion in determining who should or should not be permitted to testify as an expert and whether expert testimony is admissible, and | ¾⅛¾ judgment with respect to such matters will not be disturbed on appeal unless manifestly erroneous. Iteld v. Four Corners Const., L.P., 2012-1504, 2012-1505, 2012-1506, p. 25 (La.App. 4 Cir. 6/5/13), 157 So.3d 702, 718. See also, Molony v. Harris, 2009-1529, p. 4 (La.App. 4 Cir. 10/14/10), 51 So.3d 752, 757 (quoting Schwamb v. Delta Air Lines, Inc., 516 So.2d 452, 459 (La.App. 1st Cir.1987)). In the case before us, we find that the trial court conducted a proper Daubert hearing and did not commit manifest error by allowing the testimony of Drs. Hammar and Finkelstein pursuant to the court’s limiting instruction.
Ford’s next assignment of error is that the trial court erred by denying its motion for judgment notwithstanding the verdict because none of the plaintiffs’ experts on causation specifically identified Mr. Oddo’s exposure to Ford products (as opposed to his work on brakes in general) as being a substantial cause of his meso-thelioma. Reiterating this argument, the plaintiffs note in their brief that neither Dr. Hammar nor Dr. Finkelstein opined that “exposure to Ford products was, alone, a substantial contributing factor in the development of [Mr. Oddo’s] mesothe-lioma.”
A motion for judgment notwithstanding the verdict is defined by La. C.C.P. art. 1811. The article allows for a judgment notwithstanding the verdict on the issue of liability or damages, or both. A judgment notwithstanding the verdict is warranted when the facts and circumstances point so strongly and overwhelmingly in favor of one party that the court believes' that reasonable persons could not arrive at a contrary verdict. Therefore, if there is evidence opposed to the motion of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions, the motion should be denied. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 832 (La.1991). When considering a motion for judgment notwithstanding the verdict, the trial court should not evaluate the credibility of witnesses and should resolve all reasonable inferences or factual questions in favor- of the non-moving party. Id.; see also,-Iteld, 2012-1504, 2012-1505, 2012-1506, pp. 15-16, 157 So.3d at 722-23. The trial court’s refusal to render a judgment notwithstanding the verdict can only be overturned if it is manifestly erroneous. Peterson v. Gibraltar Sav. & Loan, 98-1601, 98-1609, p. 6 (La.5/18/99), 733 So.2d 1198, 1203 (citing Delaney v. Whitney National Bank, 96-2144, 97-0254 (La.App. 4 Cir. 11/12/97), 703 So.2d 709), on reh’g in part, 98-1601, 98-1609 (La.9/3/99), 751 So.2d 820.
Reviewing the totality of the evidence, we find no manifest error in the trial court’s denial of the motion for judgment notwithstanding the verdict. Ford’s argument as to why the motion should have been granted relies upon a misstatement *1211 of the law. The plaintiffs had the burden to show that exposure to Ford products was a substantial contributing cause of Mr. Oddo’s mesothelioma, not that exposure to Ford products alone was a cause. Moreover, the plaintiffs were not required to meet this burden solely on the basis of expert testimony; the circumstantial evidence presented must also be considered. Because there was circumstantial evidence indicating that a substantial portion of Mr. Oddo’s brake work was done on Ford vehicles using Ford parts, the trial court’s denial of Ford’s motion for judgment notwithstanding the verdict was not clearly wrong.
In this case, Drs. Hammar and Finkel-stein opined that Mr. Oddo’s 24 years of repairing and replacing brakes (from 1972 until 1996) while employed as an auto mechanic at the JPSO was a substantial factor in causing his mesothelioma. These expert opinions were based upon the testimony of fact witnesses at trial. Mr. Oddo testified in his deposition that during the time he worked for JPSO, he loused a grinder to shape brake shoes in three out of every ten brake jobs, which created a lot of dust. He had only a window fan for ventilation. Ronald Coates, who worked side-by-side with Mr. Oddo at JPSO from 1983 to 1996, testified in his deposition that they also filed brakes using emery cloth or sandpaper.[17] He further testified that they typically did five to six brake jobs per day, with each one taking forty-five minutes to an hour and a half. He also said they did not wear dust masks or any other protective equipment. Mr. Oddo’s son, Steven, who worked at JPSO with his father for six to twelve months in 1981, testified that the majority of their work was on brakes, which included blowing them out with compressed air and filing them with emery cloth. Dr. Guth provided expert testimony that the “arc-grinding” of brakes, the “roughing up” of brake pads using a wire brush or sander, and the use of compressed air to blow out brakes were all activities that would have exposed mechanics to much more than the recommended levels of asbestos at the time. He therefore concluded that Mr. Oddo was exposed to a significant amount of asbestos while performing brake jobs. Ford’s own expert in industrial hygiene, Dr. Mark Roberts, agreed that Mr. Oddo sustained an above-background level of exposure doing brake work.
In addition to the expert testimony, the plaintiffs presented sufficient circumstantial evidence from which the jury could infer that the majority of Mr. Oddo’s brake work was done on Ford cars using Ford parts. Mr. Oddo testified that he worked on a variety of cars, including Fords, but that at a certain point in time, JPSO strictly used Fords.[18] He also testified that if replacement parts were not available from Westwego Auto parts, they were obtained from Ford. Mr. I^Coates testified that ninety-five percent of the JPSO vehicles were Ford Crown Victorias. He stated that he performed first-time brake jobs on ten percent of the new Ford vehicles each year, which would involve original Ford brakes. He further testified that replacement brake pads and shoes were usually made by Ford or Bendix. Mr. Oddo’s son, William, who worked with him at JPSO for a brief time, testified that replacement brake parts were obtained from Ford dealerships. Steven Oddo testified that during the time he worked with his father, they did first repair jobs on Ford cars and used *1212 original equipment Ford parts “until the market caught up.” He further testified that in the early 1980s, JPSO ordered more than three hundred new Ford vehicles. Both he and Mr. Coates testified that each JPSO vehicle had brake work done approximately every three months.
Ford’s corporate representative, Mark Taylor, testified that Ford manufactured cars with asbestos-containing brakes from 1910 until 1996 and sold replacement parts for those brakes through 2001. Mostly all Ford vehicles manufactured through 1983 had brakes that were forty to sixty percent asbestos. Documentary evidence introduced showed that in 1972, Ford recommended sanding the lining of brakes that squealed or grabbed, and in 1973, an internal Ford document warned of the risks associated with the use of compressed air to blow out brakes.
Other than its assertion that there was insufficient proof of Mr. Oddo’s exposure to asbestos from Ford products, Ford’s defense at trial was based upon expert testimony that exposure to chrysotile asbestos, the type contained in brakes, was less likely to cause mesothelioma than exposures to more potent forms of | ¡^asbestos. All of the experts at trial agreed that chrysotile is the least dangerous type of asbestos, and that crocidolite (the type present in insulation) is the most potent. Dr. Bryan Hardin testified that crocidolite is five hundred times more potent than chrysotile. Dr. Michael Graham opined that Mr. Oddo’s mesothelioma was not caused by his exposure to brake dust, but by prior exposures he incurred before working at JPSO. Dr. Graham opined that the most likely causes were Mr. Oddo’s shipyard work at Higgins, which would have exposed him to amphibole asbestos (more potent than chrysotile but less potent than crocidolite) and/or Mr. Oddo’s residential exposure from living near the Johns-Manville plants and having a driveway composed of Johns-Manville fill, which contained crocidolite asbestos.[19] Similarly, Dr. Mark Roberts opined that the most likely sources of Mr. Oddo’s mesothelioma were his work in the Higgins shipyard, his work as an insulator at Union Carbide, and/or his time as a resident of the Westbank of Jefferson Parish where the Johns-Manville plants were located. All three Ford experts admitted, however, that some peer-reviewed studies showed a causative link between mesothe-lioma and exposure to chrysotile and/or brake dust. They each testified that they disagreed with the conclusions reached by these studies.
Under the manifest error standard, where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Arceneaux v. Domingue, 365 So.2d 1330, 1333 (La.1978); Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). If the trial court or jury findings are reasonable in light of the record reviewed in its |anentirety, the court of appeal may not reverse even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Id. (citing Arceneaux, supra, at 1333; Watson v. State Farm Fire & Casualty Ins. Co., 469 So.2d 967 (La.1985)).
In the case before us, the plaintiffs’ experts and Ford’s experts presented differ *1213 ent opinions as to whether Mr. Oddo’s exposure to Ford products while performing brake work at JPSO was a substantial contributing cause of his mesothelioma. Considering the evidence, we conclude that the jury’s finding of liability on the part of Ford is reasonable in light of the record in its entirety. Accordingly, we do not disturb that finding.
IV. LIABILITY OF NONPARTIES
The jury found that six nonparties were negligent and that their negligence was a substantial contributing cause of Mr. Oddo’s mesothelioma, but assigned no percentage of liability to any of the six. These six empty chair defendants are Union Carbide, Bendix, JPSO, Johns-Man-ville, Higgins, and Cummins. The failure to assign percentages of fault to these six nonparties is an inconsistency that violates La. C.C.P. art. 1812. See footnote 6, supra. As stated previously, the trial court’s legal error in entering judgment despite this inconsistency in the jury verdict warrants our de novo review of this issue.
We note that the defendants bore the burden of proving the liability of the nonparties under the same standard of causation by which the plaintiffs had to prove the liability of Ford and Southern Talc. Thus, the defendant’s had to prove by a preponderance of the evidence that above-background exposure to the |s1nonparty’s product (in the case of a manufacturer) or the negligence of the nonparty resulting in residential or occupational exposure to another’s asbestos-containing product (in the case of a non-manufacturer) was a substantial contributing cause of Mr. Oddo’s mesothelioma. As the Louisiana Supreme Court has noted: “[Notwithstanding the difficulty of proof involved, a plaintiffs burden of proof against multiple defendants in a long-latency case, such as a tort claim for mesothelioma, is not relaxed or reduced because of the degree of difficulty that might ensue in proving the contribution of each defendant’s product to the plaintiffs injury.” Rando v. Anco Insulations Inc., 2008-1163, 2008-1169, pp. 35-36 (La.5/22/09), 16 So.3d 1065, 1091.
In this context, we consider the evidence in the record regarding each of these six nonparties and conclude that there is insufficient evidence to show liability on the part of Bendix, JPSO, Cummins or Johns-Manville. We further conclude that the record supports a finding of liability as to Higgins and Union Carbide. Our findings as to each empty chair defendant are explained below.

Bendix

Dr. Finkelstein testified that Bendix manufactured brakes and brake products at a. plant in Ontario, Canada, across the river from Detroit. He further testified that a study done on Bendix workers showed a link between exposure to brake dust and mesothelioma. Mr. Oddo and Ronald Coates both indicated that Bendix was one of the brands they used when replacing brakes at JPSO. The record is devoid of any other evidence as to Bendix. Without further information, we find the defendants failed to show by a preponderance of the evidence that an above-background level of exposure to Bendix products was, a substantial contributing cause of Mr. Oddo’s mesothelioma.
laa Jefferson Parish Sheriffs Office
JPSO is obviously not a manufacturer but an employer/premises owner. Therefore, to prove the liability of JPSO, the defendants would first have to establish that JPSO failed to provide Mr. Oddo with a safe workplace according to what information JPSO knew or should have known about the risks of exposure to asbestos by auto mechanics during the relevant time period. Although there was tes *1214 timony by Mr. Oddo and his coworkers that they had little ventilation and did not wear dust masks, there was no evidence presented to show what knowledge JPSO had or should have had in the 1970s, 1980s, or 1990s concerning exposure to asbestos from brake dust, whether JPSO had a duty to take protective measures, or what those protective measures should have been.[20] In the absence of any evidence as to the scope of JPSO’s duty to Mr. Oddo, it is impossible to determine whether JPSO breached that duty and/or whether that breach was a substantial cause of Mr. Oddo’s mesothelioma. We therefore conclude that the record does not support a finding of negligence or liability on the part of JPSO.

Cummins

The record reflects that Mr. Oddo worked for Cummins, apparently a trucking company, for several years in the early 1960s (1961-1964).[21] Mr. Oddo testified that he did mostly shop work and also some rebuilding of generators on rigs. He further stated that he did not know where Cummins got their brakes from. There is no specific evidence in the record as to whether Cummins could be | ¡^considered a manufacturer or professional vendor of asbestos-containing products, as opposed to an employer/ premises owner. Dr. Guth opined in his expert report that Mr. Oddo was probably exposed to above-background levels of asbestos by his work at Cummins but did not offer any testimony regarding Cummins at trial. The record contains no other evidence concerning Mr. Oddo’s work at Cummins and no expert opinion that his exposure there was a substantial cause of his mesothelioma. In the absence of any evidence as to causation, the record does not support a finding of liability or negligence as to Cummins.

Johns-Manville

A preponderance of the evidence shows that Mr. Oddo lived for a year (from 1972 to 1973) in a house with a driveway composed of fill made out of waste products from Johns-Manville’s operations on the westbank of Jefferson Parish. Mr. Oddo testified that the driveway at 518 Marion Avenue was made of roofing scraps and contained asbestos. His son, William, testified that the driveway looked like it was composed of roofing scraps but he did not actually know where the scrap material had come from; he believed it was from Johns-Manville. Mr. Oddo’s son, Steven, testified that the driveway was made of a-roofing material “gumbo” that he later learned was from Johns-Manville.
The evidence showed that Johns-Man-ville was a manufacturer of asbestos cement and asphalt roofing. Johns-Man-ville’s operations led to an Environmental Protection Agency (“EPA”) investigation in the late 1980s. In 1990, sixty-three driveways were tested and were found to contain crocidolite, the most potent commercially-used form of asbestos. Mr. Oddo’s former driveway was not one of |S4the driveways tested. As a result of the EPA investigation, approximately fourteen hundred driveways were eventually reme-diated, including the driveway at 518 Marion Avenue.
*1215 Mr. Oddo testified that he raked the driveway and passed over it with his lawn mower, creating dust. This testimony was corroborated by his two sons. There was no testimony or evidence as to how frequently Mr. Oddo did this during the year he lived at 518 Marion Avenue. A preponderance of the evidence fails to demonstrate that this “disturbance” of the driveway exposed Mr. Oddo to above-background levels of asbestos. Given the fact that he lived at this address ,for only one year and the lack of evidence as to the extent of exposure from the driveway, we do not find that Mr. Oddo’s exposure to asbestos from Johns-Manville was significant enough to be a substantial contributing cause of his mesothelioma.

Higgins

Mr. Oddo testified that Higgins owned a shipyard on the Industrial Canal where he worked in the machine metal shop. His petition alleges that he worked there from 1947 to 1948 and from 1950 to 1954. It can be reasonably inferred from the evidence in the record that Higgins was a manufacturer/professional vendor of asbestos-containing ships.
Mr. Oddo specifically testified that he carried insulation to the ships and was around people doing the insulation work daily. He described the insulation as a white wrapping that was put around pipes. Dr. Finkelstein testified that insulation used on ships at that time contained am-phibole asbestos, and that being present when this insulation was installed would increase one’s risk of developing mesothe-lioma. Dr. Crapo testified that amphiboles are a well-established causative factor for mesothelioma. Dr. Guth opined that Mr. Oddo sustained an abovejbackground36 level of exposure to asbestos as a result of his work at Higgins. Dr. Hammar testified that each above-background exposure to asbestos contributes to the development of mesothelioma, but older exposures are more significant than later ones in causing the disease. He acknowledged that there were studies showing that shipyard workers have an increased risk of developing asbestos-related diseases. He explained that it does not matter what type of job the worker is doing onboard the ship, because the increased risk stems from being in closed spaces' (engine rooms, boiler rooms, below deck) where asbestos is being handled. Dr. Hammar opined that Mr. Oddo’s exposure at either Higgins or Union Carbide alone was enough to cause his mesothelioma. Dr. Roberts testified that studies on the link between asbestos exposure and disease show that shipyard workers bore the highest risk, followed by insulators and pipefitters. Like Dr. Hammar, Dr. Roberts testified that earlier life exposures are more likely to cause mesothelio-ma than later ones. He further opined that Mr. Oddo’s mesothelioma was most likely caused by the occupational exposure he sustained working at Higgins or Union Carbide, or the residential exposure he sustained from Johns-Manville’s activities, or some combination of these three. Dr. Graham testified that the type of asbestos used in shipyards, amphibole asbestos, is more potent than the chrysotile asbestos used in brakes. He also opined that Mr. Oddo’s work at Higgins was a cause of his mesothelioma.
Considering this testimony, we conclude that the preponderance of the evidence demonstrates that Mr. Oddo sustained significant exposure to asbestos from his work at Higgins and that this exposure was a substantial contributing cause of his mesothelioma.
Is6 Union Carbide
Mr. Oddo testified that he was employed by Lummis as an insulator at the Union Carbide plant during the late 1960s. His petition alleges that he worked *1216 there from 1966 to 1967. The evidence raises a reasonable inference that Union Carbide is a manufacturer of asbestos-containing products.
Mr. Oddo testified that his job at Union Carbide was to apply insulation to pipes. He further testified that he “definitely” worked with asbestos in this job, describing the material he used as being white, chalky and dust-creating. Mr. Oddo’s son, William, testified that his father came home dirty after cutting insulation for pipes at Union Carbide. Dr. Guth opined that Mr. Oddo sustained an above-background level of exposure to asbestos from his work at Union Carbide. As stated previously, Dr. Hammar opined that Mr. Oddo’s exposure to asbestos at either Higgins or Union Carbide alone was sufficient to cause his mesothelioma. Unlike his work at Higgins, Mr. Oddo’s actual job at Union Carbide required him to directly handle and manipulate asbestos-containing pipe insulation. As Dr. Roberts testified, studies show that insulators are second only to shipyard workers in the degree of risk they bear for developing asbestos-related disease. Dr. Roberts believed that Mr. Oddo’s work at Union Carbide was among the three most likely causes of his mesothelioma (along with his work at Higgins and his Johns-Manville related exposures).
We conclude that the preponderance of the evidence demonstrates that Mr. Oddo sustained significant exposure to asbestos from his work at Union Carbide and that this exposure was a substantial contributing cause of his mesothelioma.
|WY. EXCLUSION OF TRUST CLAIM FORMS
Ford’s final assignment of error is that the trial court erred by declining to admit various “asbestos bankruptcy trust” claim forms submitted by Mr. Oddo after he was diagnosed with asbestosis in 1994. These forms were submitted between 2003 and 2011 to seven bankrupt entities that had previously manufactured, sold, or used asbestos products and had set up the trusts to handle personal injury and wrongful death claims. The forms, which were proffered, contain infprmation as to what exposures Mr. Oddo believed he had incurred that allegedly had caused his asbestosis.[22] The trial court excluded the trust claim forms pursuant to La. C.E. art. 408(A), which provides:
In a civil case, evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, anything of value in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This Article does not require the exclusion of any evidence otherwise admissible merely because it is presented in the course of compromise negotiations. This Article also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.
Ford argues on appeal that the exclusion of these forms was error that prejudiced it. A trial court’s determinations regarding what evidence is admissible for the trier of fact to consider will not be overturned absent clear error. Wegener v. Lafayette *1217 Ins. Co., 2010-0810, p. 22 (La.3/15/11), 60 So.3d 1220, 1235.
We find no error in the exclusion of these claim forms. In arguing their exclusion was improper, Ford relies upon a California case which held that such | asforms were discoverable but expressly did not reach the issue of whether they would be admissible at trial. See Volkswagen of America, Inc. v. Superior Court, 139 Cal.App.4th 1981, 43 Cal. Rep.3d 723 (Cal.App. 1 Dist. 5/26/06). Moreover, the Louisiana cases relied upon by Ford are inapposite. In Ronquillo v. Belle Chase Marine Transp., Inc., 629 So.2d 1359 (La.App. 4th Cir.1993), the issue was whether the plaintiff, who allegedly injured his back while working as a seaman, could be cross-examined as to prior lawsuits he had filed claiming back injuries from automobile accidents. On appeal, this court upheld the trial court’s decision allowing the cross-examination to impeach the plaintiffs testimony but excluding the prior petitions from evidence. Similarly, the case of Brown v. Diamond Shamrock, Inc., 95-1172 (La.App. 3 Cir. 3/20/96), 671 So.2d 1049, cited by Ford, involved cross-examination using the plaintiffs prior workers’ compensation claim as impeachment after the plaintiff testified he had never before filed a disability claim. Ford’s reliance upon these cases is misplaced.
Our review of the proffered claims forms reveals that Ford’s argument ignores the nature and purpose of the Settlement Trusts to which the claims were submitted. These trusts are unique in that the submission of a claim form, assuming the claimant is deemed qualified, constitutes the claimant’s acceptance of whatever amount is offered by the trust as settlement for his claim. Each of these claim forms is thus analogous to the acceptance of a compromise. See Terrance v. Dow Chem. Co., 2006-2234, pp. 18-20 (La.App. 1 Cir. 9/14/07), 971 So.2d 1058, 1060-61 (in which the First Circuit held that the trial court had correctly refused to admit into evidence the settlement documents between the plaintiffs and the Johns-Man-ville trust fund and the amount of the compromise). Therefore the trial court correctly excluded the claim forms from evidence.
^J^Even if we had found the exclusion of the claim forms to be error, however, their exclusion in this case was harmless. The claim forms primarily relate to the Mr. Oddo’s alleged exposure attributable to Johns-Manville and to other non-parties involved in' Mr. Oddo’s work at Union Carbide. Because we have considered the liability of Johns-Manville and Union Carbide upon de novo review, any error with regard to the exclusion of these claim forms was harmless. Accordingly, we find no merit in Ford’s assignment of error as to the trust claim forms.
VI. ALLOCATION OF FAULT
Upon de novo review, we allocate fault among the liable entities as follows:
• Ford — sixty-five percent (65%)
• Union Carbide — twenty-five percent (25%)
• Higgins — ten percent (10%)
DECREE
For the reasons stated, we:
• Reverse the trial court’s judgment insofar as it finds Sud-Chemie, Inc. (Clariant Corporation/Southern Talc) liable in the survival action; finds Sud-Chemie, Inc. liable in the wrongful death action; assigns fault to Sud-Chemie, Inc,; and awards the plain *1218 tiffs survival and wrongful death damages against Sud-Chemie, Inc.[23]
• Affirm the trial court’s judgment insofar as it finds Ford Motor Company-liable in the survival and wrongful death actions.
• Amend the trial court’s judgment to assign fault as follows:
• Ford Motor Company — sixty-five percent (65%);
bn* Union Carbide — twenty-five percent (25%);
• Higgins Industries, Inc. — ten percent (10%);
• Affirm the trial court’s judgment insofar as it awards the plaintiffs the following wrongful death damages against Ford Motor Company, which amounts represent sixty-five percent (65%) of the total wrongful death damages found by the jury:
• Doris T. Oddo — $585,000.00;
• William A. Oddo, III — $390,000.00;
• Steven J. Oddo — $390,000.00.
• Amend the trial court’s judgment to delete the amount of survival damages awarded against Ford and to instead award the plaintiffs the sum of $1,150,696.58 in survival damages against Ford, which sum represents one-half (Ford’s virile share) of the total survival damages found by the jury ($2, SOIDAS).[24]
• Affirm the trial court’s judgment in all other respects.
AFFIRMED IN PART; REVERSED IN PART; AMENDED IN PART; AND RENDERED.

. The trial court’s judgment refers to Sud-Chemie, Inc.

. The record reflects that the parties agreed to try the matter to a jury of eleven members when one juror was dismissed for personal reasons after the start of trial. The trial judge noted that the law permitted the matter to be tried to a jury of eleven under these circumstances because at least nine jurors would be required to concur in the answer to each interrogatory.

.The term "empty chair’’ defendants refers to nonparties (or original parties to the suit dismissed prior to trial) that are alleged to be at fault by any party, including but not limited to (1) persons (or entities) that have been released from liability by the plaintiff(s); (2) persons who exist but whose identity is unknown; (3) persons (or entities) that are stat *1199 utorily immune from suit. See La. C.C.P. art. 1812. In the instant case, Union Carbide, Bendix and JPSO were original defendants and were dismissed by the plaintiffs prior to trial due to settlement.

. The record reflects that the five virile shares include Ford, Southern Talc, Union Carbide, Bendix and JPSO. The number of virile shares is not challenged by any party on appeal.

. This amount included Mr. Oddo’s past medical expenses, stipulated to be $201,393.15.

. Ford's motion for JNOV argued that the plaintiffs failed to introduce any expert testimony that exposure to Ford products caused Mr. Oddo’s mesothelioma. Ford assigns the denial of this motion as an error on appeal. See discussion in Part III, infra.

. La. C.C. P. art. 1812 provides, in pertinent part:
*1201 A. The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact.... The court shall give to the jury such explanation and instruction concerning the matter submitted as may be necessary to enable the jury to make its findings upon each issue....
[[Image here]]
C. In cases to recover damages for injury, death, or loss, the court at the request of any party shall submit to the jury special written questions inquiring as to:
(1) Whether a party from whom damages are claimed, or the person for whom such party is legally responsible, was at fault, and, if so:
(a) Whether such fault was a legal cause of the damages, and, if so:
(b) The degree of such fault, expressed in percentage.
(2)(a) If appropriate under the facts adduced at trial, whether another party or nonparty, other than the person suffering injury, death, or loss, was at fault, and, if so:
(i) Whether such fault was a legal cause of the damages, and, if so:
(ii) The degree of such fault, expressed in percentage.
(b) For purposes of this Paragraph, nonparty means a person alleged by any party to be at fault, including but not limited to:
(i) A person who has obtained a release from liability from the person suffering injury, death, or loss.
(ii) A person who exists but whose identity is unknown.
(iii) A person who may be immune from suit because of immunity granted by statute.
(3) If appropriate, whether there was negligence attributable to any party claiming damages, and, if so:
(a) Whether such negligence was a legal cause of the damages, and, if so:
(b) The degree of such negligence, expressed in percentage.
(4) The total amount of special damages and the total amount of general damages sustained as a result of the injury, death, or loss, expressed in dollars, and, if appropriate, the total amount of exemplary damages to be awarded.
D. The court shall then enter judgment in conformity with the jury's answers to these special questions and according to applicable law.

. These three questions seem to have no purpose, as the first three interrogatories correctly and completely addressed the standard of liability applicable to a manufacturer/professional vendor of asbestos-containing product. Requiring the jury to answer these questions as to parties they had found to be manufacturers, whose liability/non-liability they had already determined in response to prior interrogatories, potentially confused the jurors.

. The standard for determining liability in an asbestos case is different with regard to a manufacturer/professional vendor of an asbestos-containing product than it is for a non-manufacturer, such as an employer or premises owner. The liability of a manufacturer is based upon substantial exposure to its product, whereas the liability of a non-manufacturer, such as an employer/premises owner, is based upon general negligence law — that is— a duty-risk analysis which takes into account what the defendant knew or should have known about the risk posed to those working with asbestos on his premises and what actions the defendant took or should have taken to warn and/or protect those to whom his duty extended. See, e.g., Rando v. Anco Insulations, Inc., 2008-1163, 2008-1169, pp. 26-28 (La.5/22/09), 16 So.3d 1065, 1085-87; Thomas v. A.P. Green Industries, Inc., 2005-1064, p. 8 (La.App. 4 Cir. 5/31/06), 933 So.2d 843, 852. Regardless of whether the defendant is a manufacturer or a non-manufacturer, however, in an asbestos case the burden of proof as to causation is the same. As we noted in Thomas: “Although those [prior] cases involved product liability defendants and this case involves a premises owner defendant, we have held that the same causation standard applies. Zimko v. American Cyanamid, 2003-0658, p. 26 (La.App. 4 Cir. 6/8/05), 905 So.2d 465, 485, writ denied, 2005-2102 (La.3/17/06), 925 So.2d 538. Simply stated, the exposure has to be a substantial contributing factor to the plaintiffs disease.” Thomas, 2005-1064, pp. 22-23, 933 So.2d at 860.

. With respect to the legal error, the plaintiffs suggest in a footnote in their appellee brief that the jury’s answers as to Southern Talc were not inconsistent because: “It was abundantly clear at trial” that Interrogatory No. 3 "related to [Southern Talc’s] potential strict liability ... whereas Interrogatory [No.] 8 related to [Southern Talc's] liability in negligence.” The record does not support this assertion, which is not actually briefed. Moreover, as discussed herein, legally there is no distinction between strict liability and negligence as applied to the liability of a manufacturer/ professional vendor of an asbestos-containing product. The only pertinent inquiries are whether the claimant had sufficient exposure to the product and whether the exposure was a substantial contributing cause of the claimant’s injuries.

. In certain cases, a preponderance of the evidence cannot be determined fairly from a cold record, such as when there is substantial testimonial conflict that can only be resolved depending upon the fact-finder's view of the witnesses’ credibility. In such cases the appellate court may conclude that the appropriate remedy is to remand for a new trial. See, e.g., Palumbo, 2011-0769, p. 12, 81 So.3d at 930; Diez v. Schwegmann Giant Supermarkets, Inc., 94-1089, pp. 6-7 (La.App. 1 Cir. 6/23/95), 657 So.2d 1066, 1070-71.

. Woody Glen, who owned Southern Talc from 1933 until 1986, testified that neither the invoices nor the corporate ledger proved sales from Southern Talc to Johns-Manville because the documents did not note whether the seller was Southern Talc or Georgia Talc, each of which was a separate entity at the time of the sales.

. The plaintiffs relied upon test results in the corporate records of Southern Talc that were interpreted by plaintiffs' expert, Dr. Guth, as indicating the presence of tremolite in product samples taken in 1980. Southern Talc disputed Dr. Guth’s interpretation of the test results. Dr. Guth testified, however, that comparing talc samples from different time periods is like comparing "apples and oranges.” Dr. Guth stated that the fibrous components of talc samples from different time periods would likely be different, even if the talc came from the same rock deposit. He testified that he had seen no evidence of tre-molite in Southern Talc’s product during the 1950s or 1960s.

. The driveway of 518 Marion Avenue was not one of the sixty-three driveways tested.

. Plaintiffs note that Ford does not argue on appeal that the jury's findings are manifestly erroneous. Even though Ford does not specifically raise this assignment of error, our manifest error review of the jury’s findings as to Ford is warranted by our conclusion that the trial court erred by denying the motions for new trial.

. In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court set forth the criteria for determining the reliability of expert scientific testimony. The United States Supreme Court found that when, "[f]aced with a proffer of expert scientific testimony ... the trial judge must determine at the outset ... whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.” 509 U.S. at 592, 113 S.Ct. at 2796. The Louisiana Supreme Court adopted the Daubert analysis in State v. Foret, 628 So.2d 1116 (La.1993).

. Mr. Oddo testified that Mr. Coates did the same type of work as he did at JPSO.

. Mr. Oddo said this happened "after Chief Farrington came in,” but the exact time was not established at trial.

. See discussion of fault of Johns-Manville, infra.

. By contrast, there was evidence that Ford, a manufacturer, had funded studies on the subject and had documents in its corporate records showing its awareness of the risks associated with brake" dust as early as 1975.

. There is no information in the record as to the exact nature of this company, which Mr. Oddo referred to as "Cummins Diesel.” The First Supplemental and Amending Petition in this case alleges that Mr. Oddo did "diesel engine repair and installation as well as other mechanical duties” for Cummins.

. The trial court ruled that although the forms were inadmissible, the expert witnesses could rely upon them in forming their opinions.

. As stated in footnote 1, supra, the trial court's judgment refers to Sud-Chemie, Inc. This appeal was filed in the name of Clariant Corporation, successor of Sud-Chemie, Inc.

. Only one of the two nonparties found to be liable by this court was included as a virile share in the trial court’s judgment — Union Carbide. See footnote 5, supra. Accordingly, the number of virile shares that corresponds to our disposition is two rather than five. Ford, therefore, is cast in judgment for one-half the survival damages as found by the jury-